Audrey HALDEMAN, Appellee,

v.

TOTAL PETROLEUM, INC., a foreign
corporation, and Joseph Kuhn,
Appellants.

No. 84–1173.

Supreme Court of Iowa.

Oct. 16, 1985.

Rehearing Denied Nov. 14, 1985.

Bruce E. Bergman of Davis, Baker & Bergman, Des Moines, for appellants.

John C. Barrett and Griff Wodtke of Barrett & Trott, Des Moines, for appellee.

Considered by REYNOLDSON, C.J., and McCORMICK, LARSON, CARTER, and WOLLE, JJ.

LARSON, Justice.

Audrey Haldeman was employed as a service station cashier by the defendant, Total Petroleum, Inc., until her discharge following "unexplained shortages" in the employer's cash receipts.

Haldeman sued Total and Joseph Kuhn, its area manager, alleging libel and slander, breach of employment contract, wrongful discharge, and tortious infliction of emotional distress. The claims for wrongful discharge and breach of employment contract were dismissed in a summary judgment proceeding before trial.

Following a jury verdict for the plaintiff on the claims of libel, slander, and tortious infliction of emotional distress, the defendants appealed. The plaintiff cross-appealed from the dismissal of her claims for wrongful discharge and breach of employment contract. We affirm on the cross-appeal, reverse on the appeal, and remand for entry of judgment for the defendants.

The plaintiff's employment with Total began in September, 1982, as a cashier at its Hubbell Avenue station in Des Moines. As cashier, she handled the money drawer and sold gasoline, cigarettes, beer and miscellaneous merchandise. On January 11, 1983, she was working the night shift with another cashier. The following morning a cash shortage of $106.00 was discovered. Haldeman was contacted by the station manager and told not to come back to work until they "found the money." Haldeman went to the manager and volunteered to take a polygraph examination. The manager suggested she talk about it with defendant Kuhn which she did. On the same day Haldeman was contacted by the station manager, who offered her job back to her. She accepted.

Haldeman returned to work on January 15, and worked the evening shift alone. The following morning the manager called her and told her there was another shortage, this time in the amount of $91.50. Haldeman was again told not to come back to work until they solved the mystery of the missing cash.

Later, Haldeman was informed that polygraph examinations were scheduled for all of the employees on January 18, 1983. Before the polygraph examinations were given, the employees were advised by Total that they did not have to take the test and, if they chose not to, it would not affect their jobs. Following the polygraph examination, Kuhn told Haldeman she had passed the test and "not to worry" about her job. On January 20, however, Haldeman was informed by Kuhn that she and all other employees, except the manager, were terminated under a company policy of discharging all employees working a shift during which a cash shortage occurs. No one has ever discovered the reason for the shortages.

Several days after her discharge, Haldeman applied for unemployment compensation and, presumably, began to receive benefits. Plaintiff began to look for other

employment. She told several prospective employers about her discharge and the company's policy in regard to cash shortages. No employment offer was forthcoming until several weeks later when she was contacted by her former manager at Total, who offered her a job again. She told the manager that the company would have to agree, in a letter prepared by her, that she would not be terminated for "unjust or unproven reasons." The manager refused to sign the letter, and Haldeman refused the offer of employment.

Later, the manager of Flower City, a Des Moines business, contacted defendant Kuhn for a job reference on Haldeman. Kuhn gave her a generally good recommendation including her habits of punctuality and hard work. When asked about her discharge, Kuhn responded that it was due to the company's policy of discharging all employees on a shift on which a shortage occurs. He did not say that Haldeman was directly involved in the shortage. Plaintiff was not hired by Flower City.

On appeal, several issues are raised by the defendants: (1) admission of the polygraph examination; (2) submission of Haldeman's claims for libel and slander over the defendants' claims of privilege; and (3) submission of her claim for emotional distress. Other issues are raised by the defendants, including the award of exemplary damages in the libel case, and the court's instruction on libel and slander per se. We do not address these issues, however, because we hold there was no actionable libel or slander in any event. The plaintiff's cross-appeal issues, based on dismissal of the wrongful discharge and breach of employment contract claims, will be addressed briefly.

## I. *The Polygraph Evidence.*

■ The general rule is that polygraph evidence is inadmissible, at least in the absence of a stipulation by the parties. *See State v. Marti,* 290 N.W.2d 570, 586–87 (Iowa 1980); *In the Matter of the Discharge of Fairbanks,* 287 N.W.2d 579, 582 (Iowa 1980); *State v. Conner,* 241 N.W.2d 447, 457 (Iowa 1976); 3A Wigmore on Evidence § 999, at 946 (1970); McCormick on Evidence § 207, at 506 (Cleary ed. 1972).

Haldeman, as plaintiff, argued for at least a limited consideration of the polygraph evidence, and the court agreed. The basis upon which it was admitted was that it was not evidence on the question of whether Haldeman was truthful, but was part of the "operative" facts showing malice and outrageous conduct on the part of the defendants. (Malice was relevant to Haldeman's slander claims; outrageous conduct was an element of her claim of tortious infliction of emotional distress.)

■ The trial court admitted the polygraph evidence for those limited purposes and so instructed the jury. Instruction six said, in part:

> Under Iowa law such evidence is not admissible because polygraph tests are deemed scientifically unreliable. Therefore, you are instructed that you are not to consider the polygraph evidence as proof of the assertions contained therein. In other words, the results of the polygraph test is [sic] not to be considered as evidence or proof that the plaintiff was being truthful or untruthful when the test was administered.
>
> The purpose of admitting the evidence in this case is to allow you as jurors if you desire, but you are not required, to find such evidence as being part of the operative facts for the plaintiff's claims in this case that the Defendant Corporation intentionally caused her emotional distress and that both defendants acted with malice when they communicated her discharge to others.

The theory advanced by Haldeman was that her employer created an emotional roller coaster for her, making promises of renewed employment if she passed the test, then reneging. Evidence concerning the polygraph test was offered to show her compliance with the employer's request. Her polygraph examination was thus a part of the "operative facts" underlying her theories of recovery. According to her argu-

ment, they were not offered for the purpose of showing her truthfulness.

The basis for excluding polygraph evidence is usually its questionable reliability. Whether the test here was in fact reliable, however, is beside the point. We agree that it was not offered to establish her truthfulness but to show she had performed one of her employer's conditions for reemployment, *i.e.*, taking and passing the polygraph test. *Cf. Moskos v. National Ben Franklin Insurance Co.*, 60 Ill. App.3d 130, 17 Ill.Dec. 389, 392, 376 N.E.2d 388, 391 (1978) (admitted to show state of mind).

Moreover, the widespread use of the polygraph in business, industry, and government is well known. *See* McCormick on Evidence § 207, at 506–07. When, as here, the test was used at the suggestion of the employer, was apparently relied upon by it to resolve employee problems, and was actually administered by its own operator, any claim the employer might have that the test is inherently unreliable lacks some of its persuasiveness.

We believe, under the facts of this case and the court's limiting instructions, the evidence of the polygraph examination was properly admitted.

II. *The Claim of Absolute Privilege.*

When Haldeman applied for unemployment compensation, the local office of Job Service told her she would need a statement from Total verifying the fact she had been discharged. She went to the manager of the station to request such a statement, and he complied by furnishing a company "employee information" form which included a section entitled "reason for termination." The termination section had eleven printed reasons for termination. Each printed reason had a check box preceding it to designate any that were applicable. The first referred to a voluntary termination. The following ten check boxes related to various types of misconduct. One of those printed grounds was entitled "theft or fraud (must be proven)." This box was not checked by the manager, nor were any of

the other enumerated grounds on the form. Rather, on a line entitled "other reasons" the manager wrote "unexplained shortages." This form, with the manager's handwritten statement, was admitted into evidence as Exhibit 5. It is this written statement which Haldeman claims as the basis for her libel claim.

The district court ruled that Total was entitled to a qualified privilege in connection with Exhibit 5 and instructed the jury on the elements necessary to establish such privilege. Total, however, argues the court should have gone further and ruled it was entitled to an absolute privilege.

Total relies on two bases for claiming an absolute privilege. First, Job Service's claim proceedings are "quasi-judicial" in nature and thus entitled to the privilege accorded judicial proceedings. *See Cowman v. LaVine*, 234 N.W.2d 114, 121 (Iowa 1975); *Mills v. Denny*, 245 Iowa 584, 588, 63 N.W.2d 222, 224–25 (1954); Restatement (Second) of Torts § 585 (1977). The term "judicial officers," for these purposes, includes such agencies as Job Service. *See id.* at comment *b.*

Secondly, the defendants argue that Iowa Code section 96.11(7)(b)(2) (1983) immunizes a person who communicates with the Job Service in connection with the performance of its duties. That section provides:

> A report or statement, whether written or verbal, made by a person to the [Job Service] department or to a person administering this law is a privileged communication. A person is not liable for slander or libel on account of such a report or statement.

On its face, this statute appears to apply here. Haldeman argues it does not, however, for two reasons. First, she argues the statute does not expressly state that it creates an "absolute" privilege, thus it should be presumed to create only a conditional one. In any event, she argues, even if the statute creates an absolute privilege, it is inapplicable here.

We first consider the question of whether the statute applies. Haldeman points out that Exhibit 5, which contained the "unexplained shortages" language, was not a part of any official proceeding of Job Service and was not delivered to "the department or a person administering this [employment security] law." She argues that, for these reasons, the statute is inapplicable by its terms.

We believe this is a hypertechnical reading of the statute. Haldeman requested the statement from Total for the sole purpose of getting unemployment benefits. The statement was thus given in connection with the "administering" of the employment security law. The argument that the statement was actually handed to Haldeman and not to a Job Service employee is also unpersuasive. While Haldeman might have been the conduit for its delivery, the statement was clearly one given to "the department or a person administering this law" within the meaning of section 96.11(7)(b)(2). The court should have ruled that section was applicable.

■ Haldeman also argues, and the trial court ruled, that section 96.11(7)(b)(2), even if applicable, created only a qualified privilege. We do not agree. If the immunity provided by it were intended to be only a qualified one, we believe the legislature would have added words to so indicate. No qualifying language, such as "in the absence of malice ..." or its equivalent, appears. We believe the legislature by providing that "[a] person is not liable for slander or libel on account of such a report or statement," without qualifying language, intended that an absolute immunity be conferred.

Because we conclude section 96.-11(7)(b)(2) applies, and grants immunity, it is not necessary to address Total's alternative argument that it would be entitled to an absolute privilege under the rule applicable to "quasi-judicial" proceeding.

It was error on the part of the trial court to submit the issue as a qualified privilege. It should have dismissed Haldeman's libel claim against Total based upon statutory immunity.

## III. *The Qualified Privilege.*

The district court submitted the claim of slander against Total and its area manager, Joseph Kuhn, based on Kuhn's statement to Haldeman's potential employer, Flower City, regarding the reason for her discharge.

■ The district court properly ruled that a qualified privilege existed as to that communication. *See* 50 Am.Jur.2d *Libel & Slander* § 273, at 791 (1970) (qualified privilege applies to statement by employee or former employee to one having legitimate interest in information). Because a qualified privilege applies, "actual malice" would have to be established before Haldeman could recover. *See Vinson v. Linn-Mar Community School District,* 360 N.W.2d 108, 116 (Iowa 1984). The district court so instructed the jury. The burden of proving malice is on the plaintiff. 50 Am.Jur.2d *Libel & Slander* § 452, at 975–76; 53 C.J.S. *Libel & Slander* § 101, at 161 (1948).

On appeal, defendants Total and Kuhn contend there was insufficient evidence to submit the issue of actual malice. Haldeman, in response, points out that the evidence must be viewed in the light most favorable to her, and when so viewed, there was sufficient evidence to support a finding of actual malice. She points to her hiring and firing by Total, and to the fact that Kuhn told Flower City she had been discharged for unexplained shortages when in fact he believed she was innocent.

■ In *Vinson,* we discussed actual malice and contrasted it to implied malice (or malice at law):

The malice that is presumed in defamation per se is the kind of malice that our cases call implied malice or malice in law. The want of legal excuse for the act amounts to malice without regard to the motive for the statement. This kind of malice is distinct from actual malice, also called express malice, which does

depend on the motive for the statement. Actual malice requires proof that the statement was made with malice in fact, ill-will or wrongful motive.

*Vinson*, 360 N.W.2d at 117, citing *Ott v. Murphy*, 160 Iowa 730, 740–42, 141 N.W. 463, 468–69 (1913). Actual malice is required in order to defeat a qualified privilege. *Vinson*, 360 N.W.2d at 116–17; *Vojak v. Jensen*, 161 N.W.2d 100, 105 (Iowa 1968); 50 Am.Jur.2d *Libel & Slander* §§ 195, 199, at 698, 705–7; 53 C.J.S. *Libel & Slander* § 100, at 158–60 (1948).

■ The question of malice is relevant only as to the statement by Kuhn to the manager of Flower City, because only a qualified privilege applies to that statement. (The written statement furnished for Job Service, because it was absolutely privileged, would not be actionable even in the presence of malice. *See* 50 Am.Jur.2d *Libel & Slander* § 199, at 705.)

In looking at the circumstances surrounding Kuhn's "unexplained shortages" statement, we first note the actual words used. Even under Haldeman's evidence, Kuhn told Flower City that Haldeman was discharged because of the company's wholesale discharge policy; he did not say she was discharged because of her own dishonesty.

In addition, the only motive, or reason, for Kuhn's statement was to respond to an inquiry which Haldeman had herself set in motion by her job application at Flower City. There was no evidence from which a jury could infer any motive founded on ill will toward Haldeman or a desire to harm her. Even though Kuhn had doubts about Haldeman's involvement, he was not asked about his own feelings; he was merely asked why she had been discharged. Haldeman herself had told at least three potential employers the same thing—that she had been discharged because of the company policy.

■ The general rule regarding the qualified privilege in these circumstances is stated this way:

It is an established general rule that a communication respecting the character of an employee or former employee is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a definite interest therein, and this is true even though the communication contains a charge of crime. So long as good faith is present, the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not. But of course, any such communication is actionable if made maliciously.

50 Am.Jur.2d *Libel & Slander* § 273, at 791.

We conclude the court erred in submitting the slander issue because of the lack of evidence of actual malice.

## IV. *The Emotional Distress Claim.*

The defendants argue that it was error to submit the plaintiff's claim of tortious infliction of emotional distress, because there was no substantial evidence of the essential element of outrageous conduct.

■ Whether conduct may reasonably be considered as outrageous is an issue for the court to determine in the first instance. *Northrup v. Farmland Industries, Inc.*, 372 N.W.2d 193, 198 (Iowa 1985); *Vinson*, 360 N.W.2d at 118; *Roalson v. Chaney*, 334 N.W.2d 754, 756 (Iowa 1983).

■ We have approved the view of the Restatement that to be "outrageous" the conduct must be "atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, comment d (1965). The rule is summarized as follows:

Generally, the case [of outrageous conduct] is one in which the recitation of the facts to an average member of the community would arouse his resentment

against the actor, and lead him to exclaim, "Outrageous!"

*Id.*

 Here, the two statements by Total's employees concerning the reason for Haldeman's discharge were, in effect, given at her request—the first to get unemployment compensation, and the second as a part of a job reference inquiry. These statements, even when considered with her evidence of an emotional "roller coaster," fall short of the conduct envisioned by this rule. They were clearly not "so extreme in degree as to go beyond all possible bounds of decency" or the kind of conduct "regarded as atrocious, and utterly intolerable in a civilized society." *Northrup,* 372 N.W.2d at 198; *Vinson,* 360 N.W.2d at 118. In fact, when the conduct involved here is compared to that in *Vinson,* it falls short of the egregiousness of the conduct there, and in *Vinson* we held as a matter of law it was not sufficient to constitute outrageous conduct.

The trial court erred in refusing to hold as a matter of law that the conduct complained of could not reasonably be considered outrageous under the rule.

## V. *The Cross-Appeal Issues.*

 The plaintiff complains that the trial court erred in entering summary judgment against her on her claims for wrongful discharge and breach of employment contract. The trial court was right in concluding as a matter of law that Haldeman's employment was "at will" despite her evidence that independent consideration furnished by her made it an enforceable contract of employment. Employment at will, as the trial court ruled, cannot be used as a basis for an action for wrongful discharge or breach of employment contract. *See Northrup,* 372 N.W.2d at 195–96; *Abrisz v. Pulley Freight Lines, Inc.,* 270 N.W.2d 454, 455 (Iowa 1978); *Allen v. Highway Equipment Co.,* 239 N.W.2d 135, 139 (Iowa 1976).

Without foreclosing the possibility suggested in *Abrisz* that we might recognize an exception to the general rule if a discharge was based on reasons contrary to public policy, 270 N.W.2d at 455, we simply observe that this case would not fall into such an exception.

The district court properly dismissed the claim for wrongful discharge and breach of employment contract. We therefore reverse on the appeal, affirm on the cross-appeal, and remand for entry of judgment for the defendants.

REVERSED ON APPEAL, AFFIRMED ON CROSS-APPEAL, AND REMANDED.