Theo YEITRAKIS, Plaintiff,

v.

**SCHERING–PLOUGH CORPORATION,**
**Walter Gough, and Frank Markovich,**
Defendants.

Civ. No. 90–0389–JB.

United States District Court,
District Court,
D. New Mexico.

Sept. 17, 1992.

Dan A. McKinnon III, Marron, McKinnon & Ewing, Alburquerque, N.M., for plaintiff.

Thomas M.J. Hathaway, Brady Hathaway P.C., Detroit, Mich., Timothy L. Salazar, Cherpelis, Vogel & Salazar, Albuquerque, N.M., for defendants.

### AMENDED MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

In this opinion, the Court is required to consider the prelude and postscript to employment, that is, the negotiations preceding its commencement and the consequences of its termination, and must determine the extent to which alleged wrongs

then done to an employee may properly expose an employer to tortious liability. Specifically, the Court addresses whether a cause of action will lie against an employer:

1) for negligent misrepresentation, where the employee, relying on assurances of job security in pre-employment negotiations, is induced to give up secure employment elsewhere only to find his new employment to be terminable at will; and

2) for *prima facie* tort, where an at will employee is terminated for an express reason unsupported by fact which defames and attributes to the employee characteristics which interfere with his obtaining future employment.

THIS MATTER came on for a hearing on March 3, 1992, on Defendants' May 6, 1991, Motion to Dismiss and for Summary Judgment as to Counts IV and V of the Complaint, alleging fraudulent and/or negligent misrepresentation and *prima facie* tort respectively.[1] The Court took these motions under advisement and now renders its Opinion and Order.

 For the purposes of a motion to dismiss, the material allegations of the Complaint must be accepted as true. *Franklin v. Meredith*, 386 F.2d 958, 959 (10th Cir.1967). The Complaint should not be dismissed unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Further, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Id.*, at 48, 78 S.Ct. at 103. The Court shall construe the pleadings liberally, and if there is any possibility of relief, the case should not be dismissed. *Gas-a-Car, Inc. v. American Petrofina, Inc.*, 484 F.2d 1102, 1107 (10th Cir.1973).

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant bears the burden of informing the Court of the basis for the motion and of demonstrating by reference to the pleadings, together with affidavits, the absence of disputed issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court's ultimate inquiry is to determine whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## I. Negligent Misrepresentation

In June 1979, after 23 years' military service during which he rose to the rank of major, Plaintiff Theo Yeitrakis re-entered civilian life intent on pursuing a second career. To that end, he found employment as a sales representative with a pharmaceutical company, G.D. Searle & Company. In June 1982, without cause, his employment with Searle was terminated. In consequence, he was without a job, without a career and, because he had been an employee at will, without a remedy at law. For the next three months he was unemployed until, in September 1982, he was appointed Public Relations and Marketing Director for the United States Employees Credit Union in Albuquerque, New Mexico.

In early 1983, as he was approaching 45 years of age, he was "headhunted" by another pharmaceutical company, Defendant Schering–Plough ("Schering"), a New Jersey corporation, to again become a sales representative. To this end, he had a number of meetings with Philip Peacock, Schering's Phoenix District Manager, Albuquerque and New Mexico then being under the

---

**1.** Defendants' Motion to Dismiss or for Summary Judgment as to Count I (breach of implied contract of employment) was denied and as to Count II (defamation) was granted. The Court's findings in open court on March 3, 1992, were later embodied in its written Order of March 4, 1992. Count III alleging intentional infliction of emotional distress had already been dismissed, upon the parties' stipulations, by order of the Court on September 26, 1990.

purview of that District. At least one such meeting was also attended by Jim Goode, Peacock's supervisor and Schering's Western Regional Director. In May 1983, these meetings culminated in Plaintiff giving up his job at the Credit Union and commencing work as a sales representative with Schering. In September 1989, however, Plaintiff's employment was summarily terminated, for reasons discussed more fully at II. below.

■ The Complaint, at ¶¶ 3 and 4, sets out the salient points of Plaintiff's employment history and the pre-employment negotiations and, at ¶ 22, alleges:

> But for the representations made by [Schering], THEO would not have left the secure employment of the Credit Union. *If not made intentionally* the representations and assurances were negligently made and reasonably relied upon by THEO. (Emphasis added.)[2]

The emphasized phrase is ambiguous. Plaintiff further muddies the waters by submitting that, if proved, such a claim means "a fraud was practiced on him" and that "[i]n New Mexico it is clear that a negligent misrepresentation of fact can result in a fraud claim for damages". *See* Response, at 23.

If the allegedly false representations of fact were made knowingly or recklessly with intent to deceive, Plaintiff's claim would be for *fraudulent* misrepresentation. *Sauter v. St. Michael's College,* 70 N.M. 380, 374 P.2d 134 (1962). However, the Court does not understand the Complaint, considered as a whole, to allege *fraudulent* misrepresentation against Schering. Indeed, if it purports to do so, it does not meet the particularity requirements of Fed.R.Civ.P. 9(b).[3] Furthermore, each element of fraud must be shown by

clear and convincing evidence, *Sauter, supra.* The record contains no such evidence of fraudulent intent on the part of Schering and its agents. Therefore, to the extent Plaintiff's claim is expressed as *fraudulent* misrepresentation, Defendants are entitled to summary judgment.

Assuming Plaintiff's claim is for *negligent* misrepresentation, Defendants argue that New Mexico does not recognize the tort in the context of an employment relationship.

Following the Restatement (Second) of Torts § 552 (1977), New Mexico recognizes the tort of negligent misrepresentation. *Stotlar v. Hester,* 92 N.M. 26, 28–29, 582 P.2d 403 (Ct.App.1978); *Maxey v. Quintana,* 84 N.M. 38, 42, 499 P.2d 356 (Ct.App. 1972).

Section 552 of the Restatement reads in pertinent part:

*Information Negligently Supplied for the Guidance of Others*

(1) One who, in the course of his business ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) ... [T]he liability ... is limited to loss suffered (a) by the person ... for whose benefit and guidance he intends to supply the information ...; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends....

---

2. Plaintiff claims Defendants are liable for the loss of the bargain. See, Pre–Trial Order dated June 26, 1991. Plaintiff wrongly equates the measure of damages for negligent misrepresentation with that for breach of contract or *fraudulent* misrepresentation. The measure of damages is confined to Plaintiff's out-of-pocket loss. *See, First Interstate Bank of Gallup v. Foutz,* 107 N.M. 749, 752, 764 P.2d 1307 (1988) ("The damages [plaintiffs] could have recovered under a theory of negligent misrepresentation, as set out

in the Restatement, was the consideration they gave for entering into the transaction minus any value they received from that transaction, plus any pecuniary loss proximately resulting from reliance on the misrepresentation.")

3. Fed.R.Civ.P. Rule 9(b) states:

"In all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity."

Although no New Mexico case has expressly addressed the tort in the employment context, neither its elements nor its limitations make it inapplicable to the employment field. The Court therefore considers the extent to which evidence of the required elements may be found in the record. Peacock and Goode were clearly acting in the course of Schering's business in conducting recruitment discussions with Plaintiff.

Throughout these negotiations, Peacock was struck by "the degree of emphasis that [Plaintiff] ... put in the interviewing process ... of [sic] the fact that he wanted a stable and permanent career," an objective reiterated in Plaintiff's employment application ("I am looking for a *career* position.") (Emphasis in original.) Confronted with the language of at will employment in both the pre-printed application form[4] and the subsequent hiring agreement[5], Plaintiff specifically questioned Peacock about its meaning and effect, "because I was very concerned that I didn't want to be terminated without cause or for any other reason, for that matter...."

Peacock admits he "offer[ed] him every reassurance that if he was hired and if he performed at an adequate level that there should be no problem with job security."[6] And, according to Peacock, Goode "essentially said the same thing...." Furthermore, Peacock understood the source of Plaintiff's concern about job security: "[B]ecause of what had happened to [Plaintiff] at Searle, he was extremely gun-shy, so to speak, of getting into any kind of situation that might be transitory or unstable." Thus, Plaintiff "may reasonably expect to hold the maker to a duty of care ... [as] the maker was manifestly aware of the use to which the information was to be put and intended to supply it for that purpose." Restatement, § 552, Comment a.

Under the circumstances, the trier of fact could conclude this information was given for Plaintiff's guidance in the business transaction of deciding whether to leave his existing job and accept Defendant's offer of employment. Certainly, it was only after those reassurances that Plaintiff signed the hiring agreement of May 5, 1983.

Negligent misrepresentation "requires that the person receiving information have a right to rely upon it." *Stotlar v. Hester, supra*, 92 N.M. at 28, 582 P.2d 403. It remains a factual issue whether Plaintiff was justified in relying upon the information. The trier of fact must determine whether the representations could have overridden the clear import of the words in the application form and the hiring agreement or prevented Plaintiff from attaching to those words the significance they would otherwise have had. "[W]here the information concerns a fact not known to the recipient, he is entitled to expect that the supplier will exercise that care and competence in its ascertainment which the supplier's business ... requires and which, therefore, the supplier professes to have by engaging in it." Restatement, § 552, Comment e.

If Plaintiff, as he contends, performed his duties satisfactorily, Defendant's later summary termination for unsubstantiated

---

**4.** The application form concludes with a printed declaration recognizing "that if I am hired by this Company, that my employment is not for any definite period and that my service can be terminated at any time."

**5.** The hiring agreement stated: "Although either party may terminate this agreement at any time, we hope our relationship will continue for many years."

**6.** The hiring agreement indicated "[y]our employment is subject to all employee policies as described in the Employee Handbook, Sales Manual and other company communications...." The foreword to the then current employee handbook stated: "Considerations and decisions concerning ... continuance of our employees shall be made on the basis of their abilities as related to valid job requirements...." Peacock understood this to mean "you have to show cause why someone is to be terminated. You can't just summarily and arbitrarily fire someone. That was made very clear to me [by] Jim Goode.... We had to build a case to show just cause as to why someone would be let go, nonperformance of duties, blatant falsification of records or something of that nature." Other than a territory reduction, Peacock knew of no instance where a salesperson was terminated without cause.

misconduct could support the conclusion that such representations were false.

■ No written contract of employment was ever executed nor was any express agreement reached as to the duration of his employment. In these circumstances, New Mexico law has long followed the generally accepted doctrine of employment terminable at will, whereby the employment is presumed to be terminable at will by either party, at any time, for any reason or even for no reason. *See, e.g., Melnick v. State Farm Mut. Auto. Ins. Co.*, 106 N.M. 726, 730, 749 P.2d 1105 (1988), *cert. denied*, 488 U.S. 822, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988); *Gonzales v. United Southwest Nat. Bank*, 93 N.M. 522, 524, 602 P.2d 619 (1979).

The New Mexico courts have as yet evinced no intention of abandoning the doctrine completely. Rather, they have made only cautious inroads by creating two exceptions to the rule, sounding in both contract and tort.

■ One exception recognizes a cause of action for breach of an implied contract of employment, deriving from the parties' words and conduct or the employer's personnel policies. *See, e.g., Kestenbaum v. Pennzoil Co.*, 108 N.M. 20, 766 P.2d 280 (1988), *cert. denied*, 490 U.S. 1109, 109 S.Ct. 3163, 104 L.Ed.2d 1026 (1989).[7] Whether such an implied contract exists must be determined from the "totality of circumstances" and it is not any single act, phrase or expression standing alone in a vacuum which controls. *Kestenbaum*, 108 N.M., at 26, 766 P.2d 280.

■ In reliance on this exception in denying Defendants' Motion to Dismiss or for Summary Judgment as to Count I, the Court acknowledged Plaintiff had stated a cause of action, on which there were triable issues of fact, for breach of an implied contract that his employment could not be terminated except for just cause. If he succeeds in proving the existence of an implied contract, there will have been no misrepresentation. If, on the other hand, he should fail to prove such a contract, he will be permitted to seek damages on the tortious theory of negligent misrepresentation.

Accordingly, Defendants' Motion for Summary Judgment as to Count IV will be granted as to fraudulent misrepresentation but denied as to negligent misrepresentation. Plaintiff will have 10 days to amend his Complaint to conform with this Order.

## II. Prima Facie Tort

*Factual Background: Events leading up to and following Termination*

In late summer 1989, Defendant Frank Markovich, Manager of Schering's Oklahoma City District[8], began an investigation of Plaintiff[9]. Markovich concluded Plaintiff had *"intentionally falsified his call reports and field travel voucher."* (Emphasis added.) Schering District Manager Policy and Procedure 40–21 directs: "[i]f the results of your investigation suggest

---

7. Although New Mexico recognizes an additional exception to the employment at will doctrine in a cause of action sounding in tort for "retaliatory discharge" "when the discharge of an employee contravenes some clear mandate of public policy," *Vigil v. Arzola*, 102 N.M. 682, 688, 699 P.2d 613 (Ct.App.1983) *rev'd on other grounds*, 101 N.M. 687, 687 P.2d 1038 (1984), no such claim is made in this case.

8. Following internal reorganization in early 1987, Albuquerque was realigned out of Schering's Western Region and Phoenix District and into its Southwestern Region and Oklahoma City District. In 1989, Markovich, an Oklahoma citizen, held a supervisory position in relation to Plaintiff equivalent to that previously held in 1983 by Peacock, and Defendant Walter Gough,

a Texas citizen, a position as Regional Director equivalent to that held by Goode.

9. The reason for investigating Plaintiff does not clearly emerge from the record. Defendants *now* attribute it to several continuous months of steadily declining performance within the context of otherwise normal, unremarkable call activities. Yet, no such performance-related reason was given for his termination. Plaintiff argues the supposed decline may well be explained by Schering altering their assessment method from dollar sales generated value, in which Plaintiff ranked second in the region for the period ending December 1988, to a market share evaluation, under which an already established sales representative in a sparsely populated region might fare less well.

that a representative ... has falsified call reports, termination is mandatory." Therefore, by a Memo, dated August 30, 1989, to Defendant Gough, Markovich "recommend[ed] the immediate termination of employment of Mr. Yeitrakis."

On September 11, 1989, at an Albuquerque restaurant, Defendants Gough and Markovich accused Plaintiff of falsifying company documents. According to Markovich's notes of the meeting, although "[Plaintiff] ... stated that he never intentionally falsified a company document," he was provided with few particulars and given no opportunity to present a detailed answer to the accusations. Instead, Gough terminated Plaintiff's employment with immediate effect.

The reasons for his termination were communicated 1) by Defendant Schering to the Frick Company ("Frick") which relayed them to the New Mexico Employment Security Commission ("the Commission") and 2) by Plaintiff himself to the New Mexico Employment Agency and at least one prospective employer.

After termination, Plaintiff applied for unemployment benefits pursuant to the New Mexico Unemployment Compensation Act, § 51–1–1 *et seq.*, NMSA 1978. In accordance with its procedure, the Commission served a notice on Defendant Schering, requiring the corporation to give the reasons for Plaintiff's termination if "for reasons other than work." The notice warned "FAILURE TO RESPOND TO THIS NOTICE WITHIN 5 WORK DAYS SHALL BE DEEMED AN IRREVOCABLE WAIVER OF YOUR RIGHTS TO BE HEARD BEFORE A DETERMINATION IS MADE." Frick, having been instructed by Schering to act as its agent to respond to the claim, repeated the allegations of misconduct, as § 51–1–7 of the Act provides:

An individual shall be disqualified for, and shall not be eligible to receive benefits:

B. if it is determined by the division that he has been discharged for misconduct connected with his employment....

Plaintiff was initially denied unemployment benefits but, at a subsequent hearing at which Defendants, although notified, did not appear, the Commission's Appeals Bureau determined Plaintiff's discharge was for reasons *not* constituting misconduct connected with his work.

Plaintiff also sought employment elsewhere. He enlisted the assistance of the New Mexico Employment Agency, to whom he felt obliged to tell the reason why he was terminated, "[b]ecause on any job application if they find out you've lied on a job application, that's grounds to terminate you right there."

While interviewing with a prospective employer, he was specifically asked why Defendant Schering terminated him. Again, he felt obliged to tell the truth "[t]hat I was terminated for falsification of company documents and falsification of company expense report." He sought to dilute the impact of that information by denying any falsification and showing his interviewer the findings from the Appeals Bureau. Nevertheless, he did not get the job.

Defendants claimed Plaintiff falsified company documents in three respects, namely: 1) falsification of physicians' signatures on physician call documents; 2) falsification of his Weekly Activity Report; and 3) falsification of his Travel Voucher for expenses.

### Falsification of Physicians' Signatures

In carrying out his or her duties, a Schering medical sales representative is required to make calls on physicians and explain the facts, advantages and benefits of various Schering products. This practice is known as "detailing." In conjunction with detailing, the representative also provides pharmaceutical samples upon written requests by doctors for the treatment of their patients. This is known as "sampling."

When Plaintiff started with Schering, these activities were recorded on Audience Information Management ("AIM") documents and, after January 1989, on FOCUS documents. Schering "Sample Drugs— Policy" understandably insists on "*proper*

*record keeping* for accountability." (Emphasis added.)

The Pharmaceutical Drug Marketing Act of 1987, 21 U.S.C. § 301 *et seq.,* requires samples of prescription drugs be distributed only to physicians or those individuals licensed to prescribe them upon written request signed by the practitioner. Consequently, written company policies instruct sales representatives to obtain the physician's signature when samples are supplied so as to comply with the statutory requirements.[10] *See, e.g.,* Exhibit 4, ¶¶ 14, 18; Exhibit 5, Schering Sales Policy and Procedure 70–05, Audience Information Management (AIM); part of Substitute Exhibit 1 to Defendants' Motion, Schering Corporation Sampling Policies and Procedures Questions and Answers, Q. & A.'s 16–18. Plaintiff does not dispute he was aware of this requirement and that "any violation of any one of these policies may result in disciplinary action, up to and including termination." Exhibit 1.

Markovich construes company policy to say: "the responsibility lies with the representative to ensure that that's the physician's signature." Markovich Depo., 436–39, 441 (referring to policy 70–05, *supra*). This is supported by Sampling Policies and Procedures Question and Answer 17, which states that although the sales representative need not witness the signature, "[i]t is your responsibility to ensure that the signature on your call document is that of the physician and not other office personnel."

During the investigation, the veracity of signatures on AIM or FOCUS documents of four physicians was challenged and re-

mained in question at the time of Plaintiff's termination. After his termination and the publication of the reason for it, two of the four physicians verified the signatures were theirs, a third stated he had instructed his wife, out of the presence of Plaintiff, to sign the questioned document and the fourth concluded the document had probably been signed by one of his office personnel.

Defendants come forward with no evidence to show Plaintiff knew the questioned signatures were *not* those of the physicians or to suggest Plaintiff had forged them. Yet, the Employment Security Commission was informed by Defendant that Plaintiff "turned in call sheets for accounts he had not called upon." The implication goes beyond non-compliance with company policy and federal law. It suggests Plaintiff either, at a minimum, condoned someone other than the physician entering a signature on the physician's behalf or, worse yet, himself appended a signature.

*Falsification of Weekly Activity Report*

Schering Policy and Procedure 20–50 required Plaintiff to be on territory making calls from 8:30 AM to 5:00 PM, Monday to Friday. And the Employee Handbook warned: "Evidence of a representative falsifying company documents (i.e., call reports, expense reports, etc.) will lead to mandatory dismissal."

The investigation called into question the veracity of a Weekly Activity Report and a Travel Voucher for expenses Plaintiff sub-

---

**10.** Defendants points to 21 U.S.C. § 353(d)(2)(A)(ii) as the congressional mandate for obtaining the physician's signature. In fact, this relates to distribution of drugs by *mail or common carrier.* However, distribution by a sales representative suggests 21 U.S.C. § 353(d)(3)(A) is more appropriate. It provides, in pertinent part:

· The manufacturer or distributor of a drug subject to subsection (b) of this section, may, by means other than mail or common carrier, distribute drug samples only if the manufacturer or distributor makes the distributions in accordance with subparagraph (A) ... as follows:
(A) Drug samples may only be distributed—

(i) to practitioners licensed to prescribe such drugs if they make a written request for the drug samples, or
(ii) at the written request of such a licensed practitioner, to pharmacies of hospitals or other health care entities.
A written request for drug samples shall be made on a form which contains the practitioner's name, address, and professional designation, the identity of the drug sample requested, the quantity of drug samples requested, the name of the manufacturer or distributor of the drug sample, the date of the request and *signature of the practitioner making the request.* (Emphasis added.)

mitted for the week beginning August 21 through August 25, 1989.

The evidence conflicts as to whether Plaintiff worked a full day on August 23, 1989. But there is no evidence Plaintiff did not make the calls he reported. Rather, the record suggests calls were entered on the wrong day, caused by Plaintiff endeavoring to catch the one 5:00 p.m. mail pickup in Farmington, New Mexico, and in Durango, Colorado, yet visiting additional physicians after 5:00 p.m., which calls were mailed in for the following day.

*Falsification of Travel Voucher expenses*

Again, there is a conflict of evidence as to whether Plaintiff incurred motel and meal expenses for August 24 and 25.

Confronted with these factual disputes, in which Plaintiff's version was apparently preferred by the Commission's Appeal Bureau, the Defendants now somewhat disingenuously seek to shift their position from the natural meaning of "intentionally falsifying company documents." They seek to distinguish falsification from forgery, defining it as *"submitting* false reports and making false representations to Defendants in violation of Company policy and federal requirements. Plaintiff submitted physician call reports containing false physician signatures as well as field activity and travel voucher reports containing false information." Pre–Trial Order ¶ 3, at 4 (emphasis added); *see also,* Defendants' Reply, at 1 fn. 3.[11]

Plaintiff argues falsifying means forgery or submission of false documents with intent to deceive or defraud, citing *People v. Garfield,* 219 Cal.Rptr. 196, 707 P.2d 258 (1985).

Defendants not only ignore the epithet "intentional" they themselves employed

but also distort the normal meaning of the word "falsify". The word "falsify" normally means:

> To counterfeit or forge; to make something false; to give a false appearance to anything. To make false by mutilation, alteration, or addition; to tamper with; as to falsify a record or document.

Black's Law Dictionary, 5th Ed. (1968).

In what Plaintiff concedes is a "safety-valve Count," Count V alleges:

> The defendants' conduct constituted a prima facie tort against THEO because:
>
> a. One or more of them knew that by firing him under the circumstances described in the complaint he would be injured, and they either intended this injury to follow or acted recklessly in firing him;
>
> b. The termination caused by THEO's alleged misconduct was without justification and was therefore intended to injure THEO; and
>
> c. The conduct of the defendants resulted in the damage set forth...."

Complaint, ¶ 25.

Defendant argues New Mexico does not recognize *prima facie* tort in the employment discharge context and Plaintiff has neither pled nor can establish the necessary elements of the tort. Plaintiff responds that, since he was clearly injured and no other traditional tort applies, this claim fulfills the New Mexico Supreme Court's purpose in allowing a cause of action for *prima facie* tort.

*Prima facie* tort was recently recognized as a cause of action in New Mexico. *See Schmitz v. Smentowski,* 109 N.M. 386, 785 P.2d 726 (1990) (citing, *inter alia,* Restatement (Second) of Torts § 870 (1977),[12] and

---

**11.** Defendants' there contend falsification includes: *"submission* of a signature purporting to be the doctor's when it was not. ... A 'falsified' signature exists even if the representative thought the doctor had signed the document (which was not done in his presence) only to find out that a nurse had signed it. ... The reason for the falsification is not relevant. The Company has to know its documents are trustworthy." (Emphasis added.)

**12.** The modern formulation of prima facie tort is articulated in Restatement, § 870 as:

> One who intentionally causes injury to another is subject to liability to the other for that injury, if his conduct is generally culpable and not justifiable under the circumstances. This liability may be imposed although the actor's conduct does not come within a traditional category of tort liability.

*Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo.App.1980)).

■ The elements of *prima facie* tort adopted in *Schmitz* were 1) an intentional, lawful act by defendant; 2) an intent to injure the plaintiff; 3) injury to the plaintiff and 4) the absence of justification or insufficient justification for the defendant's acts. *Id.*, 109 N.M. at 394, 785 P.2d 726; *Porter, supra* at 268; Restatement, § 870, Comments b and e. In the phrase "firing him under the circumstances described in the complaint," Plaintiff appears to suggest *prima facie* tort provides a cause of action against two distinct acts of Defendants:

1) the termination itself; and

2) the unsubstantiated and factually unsupportable reason given for the termination.

### A. Prima Facie Tort & Termination of Employment At Will

Thus, the Court is required to revisit the question of what, if any, application the newly recognized doctrine of *prima facie* tort has in the context of an employment at will. On the last occasion this Court considered these two in conjunction, the central issue was whether a cause of action in *prima facie* tort will lie in the identical context of the termination of an employment terminable at will. *See Hill v. Cray Research*, Civ. No. 90–0364–JB, slip op. 1991 WL 428130 (D.N.M. July 11, 1991). There, the Court concluded *prima facie* tort was not available as a cause of action; rather, plaintiff's cause of action was either in contract for breach of an implied contract that termination would only be for just cause or in tort for retaliatory discharge, both of which were pled in his complaint.

Unlike the plaintiff in *Hill*, Plaintiff here does not allege *unlawful* conduct on the part of Defendants and therefore can satisfy the first element of intentional *lawful* conduct. *Cf. Burns Jackson Miller Summit & Spitzer v. Lindner*, 88 A.D.2d 50, 452 N.Y.S.2d 80, 93 (1982) (intentional conduct that has been recognized as tortious cannot be "lawful" conduct).

However, "Plaintiff carries an additional burden, albeit a heavy one to shoulder, of proving an "actual intent" on defendant's part to injure plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury." *Porter v. Crawford & Co., supra; Lundberg v. Prudential Ins. Co.*, 661 S.W.2d 667, 670 (Mo.App.1983). As the Restatement explains, "[t]he use of the term, injury, [in § 870] means that the harm must be to *a legally protected interest* of the plaintiff." *Id.*, Comment e. (Emphasis added.)

The established doctrine of employment at will does not provide Plaintiff with "a legally protected interest" in either continued employment or in termination only for just cause. In what is believed to be the earliest judicial statement of the rule, the Supreme Court of Tennessee said:

> All may dismiss their employees at will, be they many or few, for good cause, for no cause or even for cause morally wrong without being thereby guilty of legal wrong.

*Payne v. Western & Atlantic Railroad Co.*, 81 Tenn. 507, 519–20 (1884), *overruled on other grounds, Hutton v. Watters*, 132 Tenn. 527, 179 S.W. 134 (1915).

The doctrine of employment at will and its sometimes harsh results, particularly for the employee, have been the subject of considerable criticism by both courts and legal commentators. *See, e.g., Vigil v. Arzola*, 102 N.M. 682, 686, 699 P.2d 613 (Ct. App.1983) (citing several law review articles). Since *Vigil*, the criticism has, if anything, intensified. *See, e.g.*, Leonard, *A New Common Law of Employment Termination*, 66 N.C.L.Rev. 631 (1988). Commentators have traced the origin of the doctrine variously to the late nineteenth century ethos of freedom of contract, to the expectations and needs of both employers and employees in the age of *laissez-faire* or as part and parcel of the promotion of industrial capitalism by the courts. Over one hundred years later, both federal and state legislatures, as well as the courts, appear to have recognized those reasons lack the same force and that the

interests of society, as well as the expectations of employers and employees alike, are better served by greater regulation of the employment relationship. Consequently, lawmakers and judges have made significant modifications to the rule as it was originally stated. Legislation has proscribed race, sex, religion and national origin[13], age,[14] union activity[15], application for workers' compensation benefits[16], or jury service[17] as forbidden motivations for discharge. Additionally, judicial decisions in many jurisdictions, including New Mexico, have implied a contract to terminate only for just cause[18] and recognized a public policy exception to the rule.[19] A minority of jurisdictions, not including New Mexico, have recognized an additional exception based on an implied covenant of good faith and fair dealing in employment agreements similar to that implied in commercial contracts covered by the Uniform Commercial Code.[20]

There may be some indication that the New Mexico legislature, in giving effect to its proclaimed interest in greater job security, might be inclined to modify the at will doctrine.[21] But, to date, it has not addressed the matter and it is not for this Court to engage in piecemeal judicial tinkering in an area so peculiarly suited to comprehensive legislative consideration. Thus, in New Mexico, the at will doctrine continues to permit termination for reasons other than those specifically proscribed and those that do not fall within one of the two narrow exceptions previously discussed.

Therefore, Defendants are not required to abjure an intent to injure Plaintiff. There is a logical inconsistency between the absence of any legally protected interest of the employee in either continued employment or dismissal for good cause under the at will doctrine and the definition of injury for the purposes of *prima facie* tort in the Restatement. There is a further inconsistency between continued adherence to the long-standing legal principle permitting discharge of an employee for bad cause or without cause where employment is terminable at will and the demands of *prima facie* tort to examine the intent of the defendant employer. The record offers little support of an intent to injure on the

**13.** Civil Rights Act of 1964, §§ 701–716, 42 U.S.C. §§ 2000e–2000e–17; New Mexico Human Rights Act ("NMHRA"), § 28–1–7A NMSA 1978 (extending proscription to "color, ... ancestry, ..., physical or mental handicap or medical condition").

**14.** Age Discrimination in Employment Act of 1967, §§ 2–16, 29 U.S.C. §§ 621–634; NMHRA, § 28–1–7A NMSA 1978.

**15.** Labor Management Relations (Taft–Hartley) Act, 29 U.S.C. §§ 141–197; § 50–2–4 NMSA 1978.

**16.** New Mexico Workers' Compensation Act, § 52–1–28.2 NMSA 1978 (Repl.Pamp.1991).

**17.** §§ 38–5–18 and –19 NMSA 1978 (1987 Repl.).

**18.** By 1987, more than half the states had recognized this cause of action as an effective rebuttal of the at will presumption. *See* Gould, *The Idea of the Job as Property in Contemporary America: The Legal and Collective Bargaining Framework,* 1986 B.Y.U.L.Rev. 885, at 887 n. 6. For New Mexico cases, *see, supra,* at 243; *see also, e.g., Forrester v. Parker,* 93 N.M. 781, 606 P.2d 191 (1980); *see also Hernandez v. Home Education Livelihood Program, Inc.,* 98 N.M. 125, 645 P.2d 1381 (App.1982), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982).

**19.** By 1987, over sixty per cent of the states recognized an exception to the at will rule grounded in considerations of public policy. Leonard, *op. cit.,* at 635. In New Mexico, that sounds in tort and is termed retaliatory discharge. For New Mexico cases, *see supra,* at 243 n. 7.

**20.** *See, e.g., Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977).

**21.** In the New Mexico Unemployment Benefits Act, § 51–1–3 NMSA 1978, the legislature declared the following state public policy:
"[E]conomic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state. Involuntary unemployment is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. The achievement of social security requires protection against this greatest hazard of our economic life. *This can be provided by encouraging employers to provide more stable employment....*" (Emphasis added.)

part of Defendants. Plaintiff invites the Court to infer such intent from Defendant Markovich glaring at him at a district meeting in Oklahoma City on August 22, 1989, when Plaintiff made a facetious remark,[22] and from inadmissible hearsay.[23]

Even while recognizing the new cause of action, the New Mexico Supreme Court clearly stated that *"prima facie* tort should not be used to evade stringent requirements of other established doctrines of law" and specifically referred with approval to the law of Missouri where *prima facie* tort cannot be used to avoid the employment at will doctrine. *Schmitz,* 109 N.M. at 398, 785 P.2d 726, citing *Lundberg,* supra. *See also Dake v. Tuell,* 687 S.W.2d 191, 193 (Mo. banc 1985); *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546 (Mo.App.1983). The law of New York, to which the New Mexico Supreme Court also made reference, further confirms that *prima facie* tort and the at will doctrine do not mix. *Prima facie* tort should not be permitted to duplicate, or remedy a defect in, another established cause of action. *See D'Avino v. Trachtenburg,* 149 A.D.2d 401, 539 N.Y.S.2d 755 (2d Dept.1989) ("[T]he plaintiff may not be permitted to evade the fact that there is now no cause of action in tort for abusive or wrongful discharge of an at-will employee, or subvert the traditional at-will contract rule by casting her cause of action in terms of *prima facie* tort and intentional infliction of emotional distress."); *Monsanto v. Electronic Data Systems Corp.,* 141 A.D.2d 514, 529 N.Y.S.2d 512 (2d Dept. 1988) ("[a] *prima facie* tort cause of action cannot be allowed in circumvention of the unavailability of a tort claim for wrongful

discharge or the contract rule against liability for discharge of an at-will employee.").

 The Court therefore concludes, as it did in *Hill v. Cray, supra,* that *prima facie* tort is unavailable to remedy the termination of an at will employee, even where he is terminated for bad cause.

### B. Prima Facie Tort & the Reason Given for Termination

In this aspect, Plaintiff's interest is not in his continued employment nor in his termination only for good cause but in the legally protected interests of his reputation and to preserve the opportunity to seek future employment elsewhere, unburdened by the stigma of false and unsupportable allegations of misconduct. Defendants' conduct in giving this reason for Plaintiff's termination was originally addressed in Count II alleging defamation which the Court dismissed for the following reasons.

 Assuming that the reason given for terminating Plaintiff's employment was false and defamatory, there was no publication to Frick as it acted as Defendants' agent in the proceedings before the Commission. Frick's relayed publication of the reason to the Commission was absolutely privileged as being required by law for quasi-judicial proceedings. *Neece v. Kantu,* 84 N.M. 700, 705, 507 P.2d 447 (App. 1973), *cert. denied, Ritschel v. Neece,* 84 N.M. 696, 507 P.2d 443 (1973); *Zuniga v. Sears, Roebuck & Co.,* 100 N.M. 414, 671 P.2d 662 (App.1983). Indeed, the Commission's notice to Defendants, *supra,* at 12, compelled publication.[24]

---

**22.** When Markovich rejected Plaintiff's suggestion to sponsor hot air balloon rides for physicians at the Albuquerque Balloon Fiesta out of concern for the physicians' safety, Plaintiff remarked: "I think no doctors ever get hit in the head with a golf ball on a golf course or anything like that." Plaintiff's Depo. at 342.

**23.** Plaintiff states he was informed Defendant Gough overruled two other Schering staff who had voted Plaintiff's video presentation into first place and placed it second. He further states he was told by someone not presently a witness "to watch out for Mr. Gough, that he would sooner or later get me." Plaintiff's Depo. at 355.

**24.** The New Mexico Unemployment Compensation Act suspends the privilege against self-incrimination while granting immunity from prosecution, penalty or forfeiture for testimony or production of evidence compelled by the Commission, § 51–1–30 NMSA 1978, and provided that information obtained pursuant to the administration of the statute is confidential and its disclosure attracts criminal penalties, § 51–1–32 NMSA 1978. Although no New Mexico decision has expressly addressed the effect of these provisions, other jurisdictions extend absolute privilege to communications authorized or required by law. *See De Moss v. Metropoli-*

■ Alternatively, Plaintiff's application for unemployment benefits gave implied consent to publication to the Commission for that purpose. Consent, whether express or implied, gives rise to an absolute privilege against an action in defamation. *Neece, supra*, 84 N.M. at 705, 507 P.2d 447. *See also*, Restatement (Second) of Torts § 583 (1977); 50 *Am.Jur.2d Libel & Slander* § 185 at 688. Consent will be implied where the circumstances show that a plaintiff gave his implied consent to publication, the statement is relevant to the purpose for which that consent was given, and publication is limited to those with a legitimate interest in its publication. *See, e.g., Kraft v. William Alanson White Psychiatric Foundation*, 498 A.2d 1145 (D.C.App.1985) (consent implied from voluntary enrollment in education institution). Nevertheless, the limits of consent as a privilege or defense are clear from Exhibit 39, Schering's form for Authorization for Release of Employment Information (Terminating Employee), whereby Plaintiff withheld his consent to the release of the reason for his termination to any subsequent or prospective employer.

■ As to the additional publication by Plaintiff himself to the Employment Agency and the prospective employer, the Court was obliged to conclude Count II did not state a claim as New Mexico has yet to recognize a cause of action for self-defamation.

Only a minority of jurisdictions recognize such a claim and even they are divided as to the basis on which liability is founded. Some jurisdictions limit the claim to circumstances where "the originator of the defamatory statement has reason to believe that the person defamed will be under a *strong compulsion* to disclose the contents of the defamatory statement to a third person." *McKinney v. County of Santa Clara*, 110 Cal.App.3d 787, 796, 168 Cal. Rptr. 89, 93–94 (1980). (Emphasis added.)

*See also, e.g., Colonial Stores v. Barrett*, 73 Ga.App. 839, 38 S.E.2d 306 (1946); *Churchey v. Adolph Coors Co.*, 759 P.2d 1336 (1988). Others have found a publication where "the circumstances indicated that communication to a third party is *likely* ..." or "if a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third party...." *First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 701 (Tex.Civ.App. 1980), citing Restatement (Second) of Torts § 577, Comments m. and k. (1977).

In the absence of any clear indications New Mexico would recognize such a claim and the basis on which it would be founded, the Court felt constrained to dismiss Count II, sharing the hesitancy and restraint expressed by the District Court for the Northern District of Indiana in *Sarratore v. Longview Van Corp.*, 666 F.Supp. 1257 (N.D.Ind.1987):

[T]here simply is not the historical and judicial context at this time to predict under *Erie Railroad Co. v. Tomkins*, 304 U.S. 64 [58 S.Ct. 817, 82 L.Ed. 1188] (1938), that the Supreme Court of Indiana would adopt [this tort of self-defamation] as the law of Indiana. It might and again, it might not. Unless the judicial landmarks are so clearly evident as to point in a single direction on that subject, this court should not presume upon the functions of the Supreme Court of Indiana or indeed the Court of Appeals of Indiana with regard to the proper development of the common law in Indiana.

*Id.*, at 1264.

■ Although the underlying purpose of *prima facie* tort is "to provide remedy for intentionally committed acts that do not fit within the contours of accepted torts," *Schmitz*, 109 N.M. at 396, 785 P.2d 726, the Court does not believe *prima facie* tort

tan Life Ins. Co., 586 F.Supp. 1571 (W.D.Pa. 1984), aff'd, 760 F.2d 256 (3d Cir.1985); Harrison v. Nationwide Mut. Fire Ins. Co., 580 F.Supp. 133 (E.D.Pa.1983); Haldeman v. Total Petroleum, Inc., 376 N.W.2d 98 (Iowa 1985); Lebbos v. State Bar, 165 Cal.App.3d 656, 211 Cal.Rptr. 847

(1st Dist.1985). In each of the foregoing cases, the authority or duty imposed by law was accompanied by legislation enshrining a similar "immunity" from liability for compliance with the statutory obligation.

should be used where the essential elements of a traditional tort, in this case defamation, are missing. "The just and reasonable concept that the law should never suffer an injury and a damage without a remedy ... has its limitations. To blindly accept this rationale should not be an occasion for setting aside large bodies of case law which have ... set forth the essential elements of traditional tort. *Prima facie* tort should not become a "catch-all" alternative for every cause of action which cannot stand on its legs." *Belsky v. Lowenthal*, 62 A.D.2d 319, 405 N.Y.S.2d 62, 65, *aff'd*, 47 N.Y.2d 820, 418 N.Y.S.2d 573, 392 N.E.2d 560 (1979).

This Court is not the first to feel concern about the social impact of an unrestrained doctrine of at will employment. Nor is it alone in a sense of disquiet about the chimerical qualities of *prima facie* tort.[25] "If there are categories of legally protectible interests which are now redressed, but inadequately so, the much preferable course is to revise traditional doctrine so as to protect the interest which has gone unprotected." *Bandag, supra.* As this Court said in *Hill v. Cray:*

> [T]he value and validity of *prima facie* tort as a separate cause of action depends upon its ability to offer relief for the intentional infliction of harm where the actor's otherwise lawful conduct cannot be brought within other more traditional categories of liability. Securing that purpose requires careful monitoring that it is not merely duplicative of such categories as a 'fail-safe' in the event that one or more traditional causes of action proves defective nor that it is used to evade other established principles that make liability inappropriate.

*Id.*, slip op. at 22.

The Court therefore concludes Defendants' Motion for Summary Judgment as to Count V is well taken and will be granted.

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED that Defendants' Motion for

Summary Judgment as to Count IV be, and it hereby is, DENIED as to negligent misrepresentation and GRANTED as to fraudulent misrepresentation; and that Plaintiff shall be granted TEN (10) DAYS from date hereof to amend his Complaint in accordance with this opinion.

IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment as to Count V be, and it hereby is, GRANTED.

---

**25.** For a thoughtful treatment of the imperfections of *prima facie* tort, *see* Bieg, *Prima Facie Tort Comes to New Mexico: A Summary of* *Prima Facie Tort Law,* 21 N.M.L.Rev. 327 (1991).