**Gary KING and Shirley King, Plaintiffs,**

v.

**SIOUX CITY RADIOLOGICAL GROUP, P.C., Dr. Daryl C. Rife, Dr. Thomas R. Gleason, Dr. Gregory R. Jackson, Dr. Charles E. Flohr, and Dr. Calvin F. Andersen, Defendants.**

No. C96–4026–MWB.

United States District Court,
N.D. Iowa,
Western Division.

Nov. 20, 1997.

Patricia K. Wenger, John P. Roehrick, Roehrick, Hulting, Blumberg, Kirlin & Krull, P.C., Des Moines, IA, for Plaintiffs.

Daniel L. Hartnett, Crary, Huff, Inkster, Hecht & Sheehan, South Sioux City, NE, for Defendants.

**MEMORANDUM OPINION AND ORDER REGARDING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...............................................873

II. LEGAL ANALYSIS .............................................875
 A. Standards For Summary Judgment.......................................875
 B. Defamation...........................................................876
 1. Defamation and defamation "per se" .............................876
 2. Qualified privilege .............................................878
 C. Tortious interference with contract or business advantage ..................881
 1. Tortious interference with contract or business advantage ..............881
 2. Interference with at–will employment .............................882
 3. Summary judgment on the Kings' tortious interference claim ...........885

III. CONCLUSION ................................................886

Is this a case of a hospital administrator defamed and hounded out of his position by doctors in the department he managed who had a vendetta against him, or a case of unsupportable claims by an employee terminated after performing poorly at his job and alienating members of his support staff, medical staff, and his own superiors? Although on cross-motions for summary judgment, it is not the court's task to weigh the evidence and answer these questions, it is the court's task to determine whether the plaintiff has generated genuine issues of material fact on his claims such that he may present these questions to a jury. The plaintiff contends that he is entitled to partial summary judgment on his defamation claim to the effect that certain statements-accusing him of incompetence and being a liar—are, as a matter of law, defamatory *per se.* The defendants, doctors in the hospital department the plaintiff formerly managed, assert that, even if the statements in question are defamatory *per se,* they were made subject to a qualified privilege, and hence the doctors can incur no liability for making them. The doctors also contend that there is no genuine issue of material fact that they did not tortiously interfere with the administrator's at-will employment with the hospital. Testing the record for genuine issues of material fact, rather than weighing the evidence for truth, the court considers these cross-motions for summary judgment and partial summary judgment.

## I. INTRODUCTION

Plaintiffs Gary and Shirley King filed this lawsuit in the Iowa District Court for Woodbury County on February 15, 1996, asserting claims arising from the termination on January 31, 1995, of Gary King's employment as the Technical Director of Radiology at St. Luke's Regional Medical Center in Sioux City, Iowa. On March 8, 1996, the defendants removed the Kings' action to this federal court on the basis of diversity of citizenship, because the Kings had become residents and citizens of the state of Tennessee before this lawsuit was filed.

The defendants in this action originally included King's former employer, St. Luke's Regional Medical Center, and St. Luke's employees Gary Rees, Vice President for Human Relations, and Terry Feenstra, Vice President for Ambulatory Care. However, on September 17, 1997, the parties stipulated to the dismissal with prejudice of all claims of the Kings against these defendants. Some confusion has been engendered concerning the status of these defendants by the Kings' filing of an amended and substituted complaint and jury demand on October 3, 1997, that still identifies St. Luke's, Rees, and Feenstra as defendants, reiterates counts I through IV of the original complaint, which were brought exclusively against these defendants, and includes these defendants in count VII. However, it is the court's view, in light of the stipulated dismissal with prejudice of all claims of the Kings against these defendants, that their inclusion in the amended and substituted complaint and jury demand filed on October 3, 1997, was inadvertent. These defendants have been dismissed from this action and the court considers that no claims are currently pending against them.

The remaining defendants are Dr. Daryl C. Rife, Dr. Thomas R. Gleason, Dr. Gregory R. Jackson, Dr. Charles E. Flohr, Dr. Calvin F. Andersen, all radiologists, and their professional corporation, Sioux City Radiological Group, P.C., which provided radiological services for St. Luke's. The remaining defendants will be referred to collectively as SCRG, unless the context dictates otherwise.

Gary King's claims against SCRG are for tortious interference with his contract of employment with St. Luke's and for defamation. Shirley King asserts a claim for loss of consortium. On October 3, 1997, the Kings filed a motion for partial summary judgment on the ground that the statements upon which Gary King's defamation claim is based are libel *per se*. On October 15, 1997, SCRG moved for summary judgment on both the tortious interference claim and the defamation claim, and hence on the loss of consortium claim. Neither the Kings nor SCRG requested oral arguments on either of the summary judgment motions.

The court will not attempt here an exhaustive statement of the undisputed and disputed facts of the case.[1] Instead, the court will

---

1. Indeed, the court's efforts to ascertain precisely what facts the parties assert are genuinely in dispute has been hampered by the parties' failure to comply with N.D. IA. L.R. 56.1 regarding summary judgment motions. That rule states, in pertinent part, the following:

 Upon filing any motion for summary judgment pursuant to Rule 56 of the Rules of Civil Procedure, *there shall be filed with the motion a separate, short, and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried*, including specific reference to those parts of the pleadings, depositions, answers to interrogatories, admissions, and affidavits which support such contentions.

 The papers opposing a motion for summary judgment *shall include a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried*, including specific reference to those parts of the pleadings, depositions, answers to interrogatories, admissions, and affidavits which support such contentions.

N.D. IA. L.R. 56.1 (emphasis added). With their motion for partial summary judgment, the plaintiffs failed to include any separate statement of undisputed facts as required by the rule. They instead included only a brief "Statement of Background Facts" as part of their memorandum and attached to their motion the letter they assert is the basis for their defamation claim. Since the plaintiffs' motion involved relatively few facts in the record, however, what is far more troubling is the plaintiffs' failure to provide a separate statement of *disputed* facts in response to the defendants' extensive statement of facts in support of their cross-motion for summary judgment on all remaining claims. Instead, the plaintiffs provided only their own extended statement of facts in the form of a "chronology of events." Nor are the plaintiffs alone in their disregard of the local rule: The defendants failed to provide a

discuss disputed and undisputed facts pertinent to each claim to the extent necessary to resolve the cross-motions for summary judgment or partial summary judgment on that claim. However, a brief statement of the factual backdrop for the various claims in this action is provided here to place the court's legal analysis in context.

Gary King served as the Technical Director of Radiology at St. Luke's, an administrative, non-physician position, from mid-April of 1990 until he was terminated effective January 31, 1995. He has since taken a similar position as director of radiology at a hospital in Memphis, Tennessee. SCRG has an exclusive contract with St. Luke's to provide radiology interpretation services to the hospital. Thus, King was the technical director for the hospital's radiology department, responsible for technical and support staff and equipment, while SCRG and its doctors provided the medical services in the department.

It is undisputed that during 1993, King's relationship with the doctors in the radiology department became strained. Precisely why that is so is a matter of some dispute, however. King alleges that he had attempted to address rumors about a supposed extra-marital affair between one of the doctors and a radiology technician, and complaints about favoritism of that doctor towards that technician, inappropriate behavior and horseplay between the two in the workplace, and alleged poor treatment by that doctor of other staff members. SCRG contend that the tension arose from King's attempts to exploit groundless rumors about an affair between one of the doctors and the radiology technician to his political advantage within the department and from King's failure to perform his job adequately. Certainly, matters came to a head, not for the last time, in November of 1993, when Terry Feenstra became the hospital's vice president responsible for the radiology department. At about the

same time, Dr. Jackson, one of the members of SCRG and the medical director of the radiology department, announced that he was stepping down, leaving a vacancy in the medical director's position. On November 1, 1993, one of the other doctors of the group approached Terry Feenstra and told him that he would become the medical director of radiology, but only on the condition that King be terminated. One of the reasons that doctor gave for this condition was his distaste for the way in which King had handled the rumors concerning the supposed affair between that doctor and the radiology technician. Feenstra declined to fire King, and so informed the doctor on November 17, 1993. Another doctor eventually became the medical director of radiology.

In a meeting between Feenstra and King on November 19, 1993, Feenstra told King of the doctor's demands and advised King to develop a chronology of events regarding that doctor's treatment of technical staff. Feenstra received that chronology from King sometime in November. Because the chronology indicated that both groups were working toward a resolution of staffing issues, Feenstra concluded that the matter was essentially closed.

Matters boiled over again in April and May of 1994. On May 11, 1994, the doctors of the SCRG group had a meeting with Feenstra at which the doctors aired a number of complaints concerning King's performance and that of his assistant, Diane McCulloch. At that meeting, the doctors also specifically requested that both King and McCulloch be terminated. As a result of that meeting, Feenstra prepared a letter dated May 13, 1994, of the doctors' complaints, which he asked Dr. Gleason to sign if he concurred in the statement of the issues. Dr. Gleason did sign and return that letter, which has been marked as Exhibit 1 in this

separate statement of facts that they contend are genuinely disputed in response to the plaintiffs' motion for partial summary judgment.

What the court has been presented with, therefore, is each side's narrative of facts with that side's "spin," but no concise statement of disputed facts or the basis for each dispute. Thus, the court must glean disputed facts from the stories each side tells and their briefs, the very thing the local rule was designed to eliminate. It is the parties', not the court's, job to identify, and state the basis for, disputes of fact, so that the court can then determine whether the dispute is indeed a genuine issue of material fact.

litigation.[2] It is undisputed that this letter forms the basis for King's defamation claim.

That letter, from Feenstra to Dr. Gleason, is marked *"CONFIDENTIAL."* It states that it was "written to document the discussion and issues raised at our meeting on Wednesday, May 11," and identifies the participants at that meeting as Feenstra and doctors Rife, Flohr, Andersen, Jackson, and Gleason. The letter notes that "the physicians present ask that, for the reasons stated, both King and McCulloch be terminated from the Medical Center's employ, and that only one new manager be hired to replace these two individuals." The letter details seven "concerns" regarding King, which involve the following: (1) all of the doctors' complaints about King's alleged misrepresentation of the use of the "digital express system" and his failure to determine the problem with the system's ability to count the number of reports requested; (2) the frustration of all of the doctors over the film filing system; (3) the doctors' frustration over the central scheduling system; (4) Dr. Jackson's complaint about repeated incidents in which King allegedly addressed the doctors in an insulting and derogatory manner; (5) the doctors' assertions that "King has no respect from the staff in the department. He is a liar, manipulator and back stabber. Staff in the department are angry, disillusioned, disoriented and suffer low morale"; (6) Dr. Rife's complaint about an incident in which King threatened a subordinate with termination because a staff member had gone over King's head to Feenstra with an inquiry about a job sharing plan; and (7) Dr. Andersen's concern "that King is not very knowledgeable of basic X–Ray technique, and that King really does not know what you physicians are technically trying to accomplish in the department." Exhibit 1.

After Dr. Gleason signed the letter, acknowledging that it represented a fair statement of the doctors' grounds for requesting King's termination, Feenstra shared the letter with King and conducted an investigation. Feenstra's investigation included interviews with radiology staff and other hospital personnel. After that investigation, in June of

1994, Feenstra prepared a memorandum to his file stating his conclusion that no further action should be taken on the doctors' complaints about either King or McCulloch. Exhibit 2. In part, Feenstra's memorandum stated, "There is little, if any substance to the allegations made by the radiologists." *Id.*

Although Feenstra concluded that King should not be fired on the basis of the doctors' complaints in June of 1994, disharmony in the radiology department continued through that summer and fall. Feenstra's own relationship with King and King's relationship with other members of the staff of the radiology department clearly deteriorated. In January of 1995, Feenstra decided to terminate King's employment. The reasons for his decision, as detailed in his contemporaneous notes, were the following:

1. No relationship with radiologists.

2. Significant late evaluations.

3. Office problems worsening rather than improving.

4. Incredibly poor communications skills (verbal and written).

5. Enclave mentality—seems unable to interact with staff without someone becoming upset (consistent in my personal observations/interactions with offensive/inappropriate comments and use of offensive/inappropriate expletives).

Exhibit 22 (hand-written notes by Terry Feenstra); Exhibit 29, p. 537 (transcribed notes of Terry Feenstra). King's termination became effective on January 31, 1995.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED.R.CIV.P. 56 in a number of recent decisions. *See, e.g., Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305 (N.D.Iowa 1997); *Laird v. Stilwell,* 969 F.Supp. 1167, 1172–1174 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Center,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997); *Tralon Corp. v. Cedara-*

---

**2.** The letter was also attached to King's motion for partial summary judgment.

*pids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED.R.CIV.P. 56(b) & (c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394. With these standards in mind, the court turns to consideration of the parties' motions for summary judgment or partial summary judgment on each of the Kings' claims.

### B. Defamation

As noted above, Gary King's defamation claim is based on the letter from Terry Feenstra to Dr. Gleason, signed and acknowledged by Dr. Gleason, identifying the SCRG doctors' reasons for requesting that King be terminated. The Kings have moved for partial summary judgment to the effect that this letter constituted libel *per se,* because it accused King of being a liar and impugned his ability to perform his job adequately. The doctors have responded that, whatever the merits of King's motion for partial summary judgment may be, they are ultimately entitled to summary judgment on this claim, because the letter was clearly covered by a qualified privilege, as it represented a communication in good faith between parties, the hospital administration and doctors providing radiology services under contract to the hospital, concerning a matter of shared interest, the management of the radiology department. The Kings contend that the letter is not protected by a qualified privilege.

#### 1. Defamation and defamation "per se"

This court has discussed the Iowa law of defamation on several occasions. *See Jenkins v. Wal–Mart Stores, Inc.,* 910 F.Supp. 1399, 1425–27 (N.D.Iowa 1995); *Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097, 1124–29 (N.D.Iowa 1994); *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413, 1441–45 (N.D.Iowa 1994), *aff'd,* 61 F.3d 908 (8th Cir. 1995) (table opinion); *O'Bryan v. KTIV Television,* 868 F.Supp. 1146, 1169–71 (N.D.Iowa 1994), *aff'd in pertinent part,* 64 F.3d 1188, 1195 (8th Cir.1995). More recent decisions of the Iowa Supreme Court and Iowa Court of Appeals do not indicate any fundamental

changes in that law. *See Taggart v. Drake Univ.*, 549 N.W.2d 796, 802–04 (Iowa 1996); *Bitner v. Ottumwa Community Sch. Dist.*, 549 N.W.2d 295 (Iowa 1996); *Johnson v. Nickerson*, 542 N.W.2d 506 (Iowa 1996); *Marks v. Estate of Hartgerink*, 528 N.W.2d 539 (Iowa 1995).

■ The law of defamation consists of the twin torts of libel and slander, and the gist of a defamation action is the publication of written or oral statements that tend to injure a person's reputation and good name. *Taggart*, 549 N.W.2d at 802 ("Defamation is the invasion of another's interest in reputation or good name," citing *Johnson*, 542 N.W.2d at 510, and consists of libel and slander); *Bitner*, 549 N.W.2d at 300 (also citing *Johnson* ); *Lara v. Thomas*, 512 N.W.2d 777, 785 (Iowa 1994) (citing W. Page Keeton, et al., Prosser and Keeton on the Law of Torts § 111, at 771 (5th ed.1984)). Slander generally consists of the oral publication of defamatory matter. *Id.* Libel in Iowa is the "malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose [the person] to public hatred, contempt, or ridicule or to injure [the person] in the maintenance of [the person's] business." *Vinson v. Linn–Mar Community Sch. Dist., 360 N.W.2d 108, 115 (Iowa 1984).* As the Iowa Supreme Court recently explained, to establish a *prima facie* case of defamation, a plaintiff must show that the defendant "(1) published a statement that was (2) defamatory (3) of and concerning the plaintiff." *Taggart*, 549 N.W.2d at 802 (citing Keeton, et al., Prosser & Keeton on the Law of Torts § 113, at 802 (5th ed.1984)); *Johnson*, 542 N.W.2d at 510.

King's allegations here are founded on written, allegedly libelous statements in the letter from Terry Feenstra to Dr. Gleason.

Although the letter was originally drafted by Feenstra, it is purportedly a recitation of statements by the doctors and it was acknowledged and adopted by Dr. Gleason on behalf of SCRG. Thus, King contends, and SCRG does not appear to dispute, that the allegedly libelous statements can be attributed to SCRG. Therefore, the first questions presented here are whether these statements are defamatory or defamatory *per se*.[3]

■ In order to prevail on a defamation claim, a plaintiff must ordinarily prove that the statements were made with malice, were false, and caused damage. *Vinson*, 360 N.W.2d at 115 (citing *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968)). However, some statements, in a special category of defamation *"per se,"* are actionable without proof of malice, falsity, or special harm. *Lara*, 512 N.W.2d at 785; *Vinson*, 360 N.W.2d at 115–16; *Kelly v. Iowa State Educ. Ass'n*, 372 N.W.2d 288, 295 (Iowa.Ct.App. 1985). Words are defamatory *per se* if they are of such a nature, whether true or not, that the court can presume as a matter of law that their publication will have libelous effect. *Vinson*, 360 N.W.2d at 116 (citing *Haas v. Evening Democrat Co.*, 252 Iowa 517, 107 N.W.2d 444, 447 (1961)). Among such statements are defamatory imputations affecting a person in his or her business, trade, profession, or office. *Lara*, 512 N.W.2d at 785; *Vojak v. Jensen*, 161 N.W.2d 100, 104 (Iowa 1968); *Galloway v. Zuckert*, 447 N.W.2d 553, 554 (Iowa.Ct.App.1989), *cert. denied*, 494 U.S. 1057, 110 S.Ct. 1526, 108 L.Ed.2d 765 (1990). Iowa courts have also repeatedly held that it is libel *per se* to publish statements accusing a person of being a liar, cheater, or thief. *Spencer v. Spencer*, 479 N.W.2d 293, 296 (Iowa 1991) (citing Prosser and Keeton on the Law of Torts § 111), *cert. denied*, 506 U.S. 840, 113

---

**3.** There would ordinarily be an issue precedent to whether the statements in question are defamatory, because "[t]o prevail [on a defamation claim], [the plaintiff] must prove that the alleged defamatory statements were published." *Marks*, 528 N.W.2d at 545. However, the defendants do not appear to contest the question of whether the statements in question here were published at all, despite the fact that they might be characterized as intra-hospital communications, are in a document marked "confidential," and hence were not generally communicated to the public. *Cf. Taggart*, 549 N.W.2d at 803 (concluding that under two lines of authority, intra-university communications in question in that case either were never published or, if published, were protected by qualified privilege). Because the parties do not assert otherwise at this stage of the proceedings, the court will not consider further here whether the statements in the May 13, 1994, letter were "published."

S.Ct. 120, 121 L.Ed.2d 76 (1992); *Vinson*, 360 N.W.2d at 116 (calling a person a liar is libel *per se* and the court held there was "no meaningful distinction between accusing a person of being a liar and accusing a person of falsifying information"); *Galloway*, 447 N.W.2d at 555 (it is libel *per se* to call a person a liar or to make statements that impute dishonesty to a person).[4]

■ The statements in question here, as set out in Exhibit 1, include statements that King was not competent in his employment, *see Lara*, 512 N.W.2d at 785; *Vojak*, 161 N.W.2d at 104; *Galloway*, 447 N.W.2d at 554, and was a liar. *See Spencer*, 479 N.W.2d at 296; *Vinson*, 360 N.W.2d at 116; *Galloway*, 447 N.W.2d at 555. The court holds that, as a matter of law, the statements in question constitute libel *per se.* The Kings are therefore entitled to partial summary judgment to that effect. FED.R.CIV.P. 56(c) (summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law").

■ This is not to say that the court takes any position on the truth or falsity of the statements-that will be for the jury to decide. A finding that the statements are libelous *per se* relieves the plaintiff of the obligation to prove that the statements were false. *See Lara*, 512 N.W.2d at 785; *Vinson*, 360 N.W.2d at 115–16; *Kelly*, 372 N.W.2d at 295. However, the truth of the libelous statements remains as an absolute defense to liability for those statements, *see, e.g., Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996) ("Truth of the statement is an absolute defense" to a defamation claim), even if the statements constitute libel *per 'se*, *see Kelly v. Iowa State Educ. Ass'n*, 372

N.W.2d 288, 295 (Iowa.Ct.App.1985) ("truth" is a defense to a defamation claim, but it is "irrelevant to the defendant's assertion that the writings were not libel per se"), provided, of course, the defendant has properly pleaded and ultimately proves the affirmative defense of "truth." *See, e.g., Spencer*, 479 N.W.2d at 296 (the defendant failed to prove "his affirmative defense of truth" to a defamation claim); *Cowman v. La Vine*, 234 N.W.2d 114 (Iowa 1975) (truth of a statement is a defense in justification in a slander action that must be specially pleaded in order to be raised, citing IOWA R. CIV. P. 101).

The defendants do not appear to argue that the statements in the May 13, 1994, letter were not libel *per se.* Instead, they argue that *they* are entitled to summary judgment on the Kings' defamation claim, because they enjoyed a qualified privilege to communicate the statements in question to the hospital administration, even though those statements are *per se* libelous.

### 2. *Qualified Privilege*

■ Although King has alleged defamation *per se*, the law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another that are defamatory or defamatory *per se*, and in such circumstances a "qualified privilege" bars liability. *Taggart*, 549 N.W.2d at 803;[5] *Vojak*, 161 N.W.2d at 104; *Higgins v. Gordon Jewelry Corp.*, 433 N.W.2d 306, 308 (Iowa.Ct.App.1988). As the Iowa Supreme Court has explained, "A statement is said to be privileged when one is *justified* in communicating defamatory information which would ordinarily be actionable

---

**4.** Although not pertinent here, accusing a person of a crime is also defamatory *per se* when the crime charged is indictable, and involves moral turpitude or subjects one to a sentence of incarceration. *Rees v. O'Malley*, 461 N.W.2d 833, 835 (Iowa 1990); *Amick v. Montross*, 206 Iowa 51, 57, 220 N.W. 51, 54 (1928).

**5.** Communications may also be "absolutely" privileged. *Taggart*, 549 N.W.2d at 803 (citing *Vojak*, 161 N.W.2d at 105); *Marks*, 528 N.W.2d at 545 (also citing *Vojak*). For example, the Iowa Court of Appeals has recognized that Iowa Code § 96.11(7)(b) creates an "absolute" privi-

lege for a letter from an employer to the Iowa Job Service stating reasons for an employee's termination, *see Palmer v. Women's Christian Ass'n of Council Bluffs, Ia.*, 485 N.W.2d 93 (Iowa.Ct.App.1992) (although even this "absolute" privilege may be overcome), and the Iowa Supreme Court has recognized that there is an "absolute" privilege from liability for defamation that takes place in judicial proceedings. *See Spencer*, 479 N.W.2d at 293. However, the defendants here have not asserted any "absolute" privilege to King's defamation claim.

without incurring liability." *Marks,* 528 N.W.2d at 545 (citing *Vojak,* 161 N.W.2d at 105; emphasis added). Therefore, "[t]o say a statement is privileged simply means no liability attaches to its publication." *Id.* " 'The qualified privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within narrow limits.' " *Id.* (quoting *Vojak,* 161 N.W.2d at 105). Qualified privilege applies to publications without regard to whether they are defamation or defamation *per se. Taggart,* 549 N.W.2d at 803–04.

■■■■ There are several requirements that must be met to invoke the privilege. Defendants may raise qualified privilege as a defense if they can show that they made the defamatory statements in the proper circumstances:

> Qualified privilege attaches to communications made (1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation.

*Taggart,* 549 N.W.2d at 803 (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)). *Accord Marks,* 528 N.W.2d at 545; *Fischer v. UNIPAC Serv. Corp.,* 519 N.W.2d 793, 795 (Iowa 1994); *Lara,* 512 N.W.2d at 785; *Vinson,* 360 N.W.2d at 116 ("[A] qualified privilege applies to statements without regard to whether they are defamatory per se when they are made on an appropriate occasion in good faith on a subject in which the communicator and addressee have a shared interest, right or duty."). To put it another way, the statements must be made "in a manner and under circumstances fairly warranted by the occasion." *Lara,* 512 N.W.2d at 785; *Knudsen v. Chicago & North Western Transp. Co.,* 464 N.W.2d 439, 442 (Iowa 1990); *Rees v. O'Malley,* 461 N.W.2d 833, 837 (Iowa 1990). Thus, although the qualified privilege " 'is not restricted within narrow limits,' " *Marks,* 528 N.W.2d at 545 (quoting *Vojak,* 161 N.W.2d at 105), it nevertheless must not be abused or exceeded. *Lara,* 512 N.W.2d at 786.

■■■■ The privilege never attaches if the statements are not made in good faith. *Lara,* 512 N.W.2d at 786, *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98, 104 (Iowa 1985). So long as good faith is present,

> the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not.

*Haldeman,* 376 N.W.2d at 104 (quoting 50 Am.Jur.2d *Libel & Slander* § 273, at 791).

■■■■ The privilege may be lost if the statements were made with actual malice. *Taggart,* 549 N.W.2d at 804; *Marks,* 528 N.W.2d at 546 ("The privilege, however, only protects statements made without actual malice."); *Knudsen,* 464 N.W.2d at 443; *Haldeman,* 376 N.W.2d at 104 (" 'But of course, any such communication is actionable if made maliciously,' " quoting 50 Am.Jur.2d *Libel & Slander* § 273, at 791); *Vinson,* 360 N.W.2d at 116. "In other words a publication is no longer privileged and becomes actionable upon proof of actual malice." *Taggart,* 549 N.W.2d at 804. As distinct from legal malice and from actual malice under *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964),[6] actual malice in

---

**6.** Under the constitutional standards established in *New York Times,* "actual malice" must be shown before a private figure plaintiff may recover punitive damages, *In re IBP Confidential Bus. Documents Litigation; Bagley v. Iowa Beef Processors, Inc.,* 797 F.2d 632, 647 (8th Cir.1986) (citing *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 775, 106 S.Ct. 1558, 1563, 89 L.Ed.2d 783 (1986)), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1293, 94 L.Ed.2d 150 (1987), and· before a public figure plaintiff may recover any damages. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 335–36, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (1974). "Malice" under *New York Times*

does not refer to ill will. *Price v. Viking Penguin, Inc.,* 881 F.2d 1426, 1433 (8th Cir.1989), *cert. denied,* 493 U.S. 1036, 110 S.Ct. 757, 107 L.Ed.2d 774 (1990). The primary focus must be on the defendant's attitude toward the truth of the statements, rather than on the defendant's attitude toward the plaintiff. *Id.* A statement is made with "actual malice" if it is made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Bagley,* 797 F.2d at 643 (citing *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 726). Actual malice in this context must be established by clear and convincing evidence. *Id.*

this context "turns on the motive for the communication." *Taggart*, 549 N.W.2d at 804; *Haldeman*, 376 N.W.2d at 103–04 (actual malice in this context "does depend on the motive for the statement."). Actual malice requires proof that the statement was made with malice in fact, ill-will, hatred, the desire to do harm, or wrongful motive. *Id.* (citing *Vinson*, 360 N.W.2d at 117); *Marks*, 528 N.W.2d at 546; *Haldeman*, 376 N.W.2d at 103–04 (also citing *Vinson*); *Benishek v. Cody*, 441 N.W.2d 399, 403 (Iowa.Ct.App. 1989). Actual malice is shown when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity. *Id.; Marks*, 528 N.W.2d at 546 ("[Actual malice] may also result from reckless or wanton disregard of the rights of others."). The privilege does not extend to publication to the general public. *Rees*, 461 N.W.2d at 837 (citing *Brown*, 193 N.W.2d at 552). However, in the absence of actual malice, the qualified privilege extends even to statements that are not true. *Marks*, 528 N.W.2d at 546; *Vojak*, 161 N.W.2d at 105; *Benishek*, 441 N.W.2d at 402 (citing *Vojak*).

■ In summary, the elements of the qualified privilege defense are that: (1) the statements were made in good faith; (2) the defendant had an interest to be upheld; (3) the statements were limited in their scope to this purpose; (4) the statements were made on a proper occasion; and (5) publication was in a proper manner and to proper parties only. *Marks*, 528 N.W.2d at 545–46; *Knudsen*, 464 N.W.2d at 439 (citing *Brown*, 193 N.W.2d at 552 (Iowa 1972)). The privilege is lost if the statements were made with actual malice, as defined above. *Taggart*, 549 N.W.2d at 804; *Marks*, 528 N.W.2d at 546; *Knudsen*, 464 N.W.2d at 443; *Haldeman*, 376 N.W.2d at 104.

■ Ordinarily, it is for the court to decide whether the privilege is available for the communication in question. *Marks*, 528 N.W.2d at 546; *Vinson*, 360 N.W.2d at 116; *Brown*, 193 N.W.2d at 547; *Higgins*, 433 N.W.2d at 308; RESTATEMENT (SECOND) OF TORTS § 619(1), p. 316 (1977). The burden is on the defendant to establish the existence of a qualified privilege. *Lara*, 512 N.W.2d at 785; *Rees*, 461 N.W.2d at 837. Qualified

privilege is an affirmative defense that must be pleaded and proved. *Taggart*, 549 N.W.2d at 803; *Vinson*, 360 N.W.2d at 116; *Higgins*, 433 N.W.2d at 311 (quoting *Vinson*). *See also Spencer*, 479 N.W.2d at 296 (qualified privilege is one of the "affirmative defenses" to defamation on which the court properly instructed jury). The court concludes that where no genuine issue of material fact exists to deny an available privilege, for example on the grounds of actual malice or lack of good faith, the court may enter summary judgment in favor of the defendant.

■ Those are not the circumstances presented here, however. Rather, the court finds that there is a genuine issue of material fact as to the "good faith" of the doctors of SCRG in making the defamatory statements embodied in the May 13, 1994, letter. *See* FED.R.CIV.P. 56(c) (summary judgment may only be granted where the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."). The doctors' "good faith" is a material issue to their qualified privilege defense, and hence to the Kings' defamation claim. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (a factual dispute is "material," and will therefore preclude summary judgment, if it "might affect the outcome of the suit under the governing law"); *Beyerbach*, 49 F.3d at 1326 (same); *Hartnagel*, 953 F.2d at 394 (same). The record gives rise to reasonable inferences that the doctors' statements embodied in the May 13, 1994, letter were *not* made in good faith. Viewing the record in the light most favorable to the Kings, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick*, 90 F.3d at 1377 (same), these inferences arise, at least in part, because after some investigation, Terry Feenstra concluded, in his memorandum to the file-marked Exhibit 2–that "[t]here is little, if any substance to the allegations made by the radiologists" in that letter. *See Hartnagel*, 953

F.2d at 394 (an issue of material fact is genuine if it has a real basis in the record).

Furthermore, there is a genuine issue of material fact as to the absence of actual malice in the summary judgment record. This genuine issue of material fact is also generated by Terry Feenstra's conclusions after investigation that the allegations leveled at King in May of 1994 were unfounded, because unfounded allegations reasonably give rise to an inference of intent to do harm to the target of those allegations. *See Taggart*, 549 N.W.2d at 804 (actual malice requires proof that the statement was made with malice in fact, ill-will, or wrongful motive, citing *Vinson*, 360 N.W.2d at 117, and when a statement is made with knowledge that it is false or with reckless disregard for its truth or falsity); *Marks*, 528 N.W.2d at 546 (adding to the list in *Taggart* hatred and desire to do harm and reckless or wanton disregard of the rights of others); *Haldeman*, 376 N.W.2d at 103–04 (also citing *Vinson*); *Benishek*, 441 N.W.2d at 403 (same). A reasonable inference concerning actual malice also arises from portions of the record showing the apparent antipathy of one of the doctors for King over King's allegations about, and handling of, rumors concerning an extra-marital affair, and that doctor's repeated efforts, or participation in efforts, to have King removed over more than a year's time. Therefore, the defendants' motion for summary judgment will be denied as to the Kings' defamation claim.[7]

### C. *Tortious Interference*

SCRG has also moved for summary judgment on the Kings' tortious interference claim. The first dispute between the parties, a legal one, is whether, because King was an at-will employee of St. Luke's, his tortious interference claim can be characterized as "tortious interference with a contract," or must instead be characterized as "tortious interference with a business advantage." This dispute involves more than mere seman-

tics, because the elements of the two claims are somewhat different. *See RTL Distrib., Inc. v. Double S Batteries, Inc.*, 545 N.W.2d 587, 590 (Iowa.Ct.App.1996) (noting this distinction). Indeed, SCRG has moved for summary judgment in part on the ground that the Kings cannot generate a genuine issue of material fact on the more stringent requirement of a "business advantage" claim that SCRG intended to financially injure or destroy King. The Kings assert that Iowa decisions cannot be read to impose this strict requirement on at-will employment cases. Thus, the court must first determine the elements of the Kings' claim.

### 1. *Tortious interference with contract or business advantage*

▮▮▮▮▮▮ This court has twice considered in some detail the elements of tortious interference claims under Iowa law. *See Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F.Supp. 1445, 1467–68 (N.D.Iowa 1996); *Fink v. Kitzman*, 881 F.Supp. 1347, 1382–83 (N.D.Iowa 1995). Under Iowa law, a claim of tortious interference with a contract is based on the RESTATEMENT (SECOND) OF TORTS § 766 (1977):

> One [SCRG] who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another [King] and a third person [St. Luke's] by inducing or otherwise causing the third person [St. Luke's] not to perform the contract, is subject to liability to the other [King] for pecuniary loss resulting to the other [King] from the failure of the third person [St. Luke's] to perform the contract.

*Grahek v. Voluntary Hosp. Co-op.*, 473 N.W.2d 31, 35 (Iowa 1991); *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa 1985); Iowa Civil Jury Instruction 1200.1. Thus, the plaintiff must prove the following elements

1. The plaintiff had a valid contract.

---

7. Although the defendants have alluded to the rather tenuous causal link between their defamatory statements in the May 13, 1994, letter, if made in the absence of a qualified privilege, and King's termination some eight months later in January of 1995, the record also gives rise to

inferences, reasonable if slight, that the letter was one of the circumstances causing King's termination. At trial, this causation question may loom as large as the "actual malice" and "good faith" issues the court has considered in more detail in the body of this decision.

2. The defendant knew of the contract.

3. The defendant intentionally and improperly interfered with the contract.

4. The interference caused the contracting parties not to perform the contract with the plaintiff.

5. The amount of the plaintiff's damages.

*See Water Dev. Co. v. Board of Water Works,* 488 N.W.2d 158, 161 (Iowa 1992) (citing *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 194 (Iowa 1990)). *See also* Iowa Civil Jury Instruction 1200.1. This tort is not committed by parties to the contract; the tortfeasor must interfere with a contract between another and a third person. *Grahek,* 473 N.W.2d at 35. The tort plainly requires that a third party, who is a party to the underlying contract, be induced or caused to act by the alleged tortfeasor, who must be a stranger to the contract. *Id.*

 Unlike tortious interference with a contract, the tort of interference with business relations or advantages does not require a showing that a contract existed between the plaintiff and another. *Toney v. Casey's Gen. Stores, Inc.,* 372 N.W.2d 220, 222 (Iowa 1985); *Clark v. Figge,* 181 N.W.2d 211, 213 (Iowa 1970). A more essential distinction, in most cases, between this tort and the tort of interference with contractual relations is that, for the tort of interference with business relations or advantages, the tortfeasor must be shown to have had as a purpose for its interference "to financially injure or destroy the plaintiff," while no such showing of intent is necessary for the tort of interference with a contract. *See Burke v. Hawkeye Nat'l Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991); *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990); *Page County Appliance Ctr., Inc. v. Honeywell, Inc.,* 347 N.W.2d 171, 177 (Iowa 1984); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984); *First Medical, Inc. v. Embassy Manor Care Ctr., Inc.,* 483 N.W.2d 14, 16 (Iowa.Ct.App.1992).

 Whatever the differences between the two "tortious interference" claims, however, the tort of tortious interference with a business advantage is also premised on the acts of a stranger to the relationship interfering with relations between the plaintiff and another, as is shown by the elements of the tort:

1. The plaintiff had a prospective [contract or business relationship] with a [third person].

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship by [set forth the particulars supported by the evidence].

4. a. The interference caused [the third person] not [to enter into or continue] the relationship [or]

 b. The interference prevented the plaintiff from [entering or continuing] the relationship.

5. The amount of damage.

Iowa Civil Jury Instructions, 1200.2; *see generally Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990); *Gordon v. Noel,* 356 N.W.2d 559, 563 (Iowa 1984); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984).

### 2. Interference with at-will employment

The parties do not dispute that King was an at-will employee of St. Luke's. However, they do dispute the repercussions of that fact for his tortious interference claim. SCRG maintains that the proper claim when at-will employment is involved is tortious interference with a business advantage, and that the Kings cannot generate a genuine issue of material fact as to SCRG's intent to financially injure or destroy King, an essential element of such a claim, as explained above. The Kings contend that, even in at-will employment cases, the proper claim is tortious interference with an existing contract of at-will employment, and only "improper purpose" must be proved, not "intent to financially injure or destroy" the plaintiff.

At-will employment does present a somewhat unique analysis when a claim of "tortious interference" is asserted. As the Iowa Court of Appeals recently explained,

The existence of an at-will contract of employment, however, does not insulate a defendant from liability for tortious interfer-

ences. *See Toney v. Casey's General Stores, Inc.,* 460 N.W.2d 849, 853 [ (Iowa 1985) ]; Restatement (Second) of Torts § 766 cmt. g (1979). *See also Europlast, Ltd. v. Oak Switch Systems, Inc.,* 10 F.3d 1266, 1274 (7th Cir.1993). Until a contract is terminated, it remains valid and subsisting, and third persons may not improperly interfere with it. Restatement (Second) of Torts § 766 cmt. g. (1979). Nevertheless, *the standard of proof is more demanding when the employment contract is at-will, and our law of contract interference applies different rules. Water Dev. Co. v. Bd. of Water Works, 488 N.W.2d 158, 162 (Iowa 1992). A higher standard is required because interference with at-will employment contracts only gives rise to the interference with a future expectancy, not a legal right. Restatement (Second) of Torts § 766 cmt. g (1979). The situation, therefore, is more analogous to the interference with a prospective contractual relation, with the corresponding greater freedom of action on the part of the defendant. Water Dev. Co.,* 488 N.W.2d at 162; *Toney,* 460 N.W.2d at 853–54, (quoting Prosser and Keeton on the [L]aw of Torts § 129, 996 (5th ed.1984)).

The torts of interference with an existing contract and interference with a prospective contractual relation both require the interference to be "improper." *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990). *The term "improper," however is defined differently for each tort. Id. In cases involving interference with a prospective contract, the defendant's purpose must be to financially injure or damage plaintiff's business. Id. There must be substantial evidence of a predominant motive by the defendant to terminate the contract for improper reasons. Water Dev. Co.,* 488 N.W.2d at 162; *Toney,* 460 N.W.2d at 853. *This same requirement is applied to at-will employment contracts.*

*RTL Distrib.,* 545 N.W.2d at 590 (emphasis added).

SCRG relies on *RTL Distributing* and, more specifically, upon the cases cited therein for the proposition that the Kings must prove SCRG's intent to financially injure or destroy Gary King. Although the Kings acknowledge the existence of the *RTL Distributing* decision, they attempt to distinguish or interpret it and the cases upon which it relies. They assert that, in *Toney,* because the employment contract in question was for at-will employment, the Iowa Supreme Court required "substantial evidence of a predominant motive on the part of Casey's to terminate the employment of Toney for improper reasons," *Toney,* 460 N.W.2d at 853, but that any reference to interference with "business advantage," rather than interference with a contract, arose "in a business sense, i.e., hiring away employees, and not interfering with existing employment contracts." Plaintiffs' Brief In Resistance To Motion For Summary Judgment, p. 2. They distinguish *Water Development* on the ground that it involved business competitors and contracts for water services, not employment contracts. *Id.* at 2–3. Finally, the Kings state that the Iowa Court of Appeals in *RTL Distributing* "found that the predominant purpose had to be an intent to destroy or injure," but that, because the case involved business competitors and the hiring away of an employee, "no Iowa case has yet decided that the predominant purpose in an employment case wherein a third party interferes with an employment arrangement between the employer and employee requires the predominant purpose to destroy or injure the employment status of the employee." *Id.* at 3. They contend, to the contrary, that under Iowa law, no "predominant purpose" is required in at-will employment cases, only "improper means."

The Kings' and SCRG's characterizations of Iowa law aside, the court finds that the decisions of the Iowa Supreme Court in *Toney* and the Iowa Court of Appeals in *RTL Distributing* settle the question of the nature and elements of a claim of tortious interference with at-will employment. First, in *Toney,* after examining the pertinent provisions of the RESTATEMENT (SECOND) OF TORTS, sections 766, 766A, 767, and comments thereto, the Iowa Supreme Court wrote,

One authority, while noting that employment and other contracts terminable at will may be the subject of actions for interference, states that

a contract at will is usually not protected when the defendant's interference with it is based on any legitimate business purpose and no improper means is used, as where one employer hires away employees of another whose contract rights are terminable at will. The principle would logically apply to any agreement that could not be enforced as a contract, since such an agreement can be avoided at will, as where a contract lacks mutuality. In all such cases the plaintiff's interest may be protected, but as a prospective advantage rather than as a contract, with the correspondingly greater freedom of action on the defendant's part.

*Prosser and Keeton on the Law of Torts* § 129, at 995 (5th ed.1984).

*Applying these principles to the present case, we believe that there must be substantial evidence of a predominant motive on the part of Casey's to terminate the [at-will] employment of Toney for improper reasons.*

*Toney*, 460 N.W.2d at 853 (emphasis added). Similarly, the court reads *RTL Distributing* to state that interference with at-will employment is *analogous* to interference with a prospective business advantage, not to interference with an existing contract. Indeed, this is what the Iowa Court of Appeals said: "The situation [of at-will employment], therefore, is more analogous to the interference with a prospective contractual relation, with the corresponding greater freedom of action on the part of the defendant." *RTL Distrib.*, 545 N.W.2d at 590. The reason for the analogy, the Iowa Court of Appeals explained, is that "interference with at-will employment contracts only gives rise to the interference with a future expectancy, not a legal right." *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 766 cmt. g (1979)). To parse the decision of the Iowa Court of Appeals further, that court wrote,

In cases involving interference with a prospective contract, the defendant's purpose must be to financially injure or damage plaintiff's business. [*Nesler v. Fisher & Co., Inc.*, 452 N.W.2d 191, 199 (Iowa 1990).] There must be substantial evidence of a predominant motive by the defendant to terminate the contract for improper reasons. *Water Dev. Co.*, 488 N.W.2d at 162; *Toney*, 460 N.W.2d at 853. *This same requirement is applied to at-will employment contracts.*

*RTL Distrib.*, 545 N.W.2d at 590. As this court reads the decision, the tortfeasor's purpose must be "to financially injure or damage plaintiff's business," while the "financial injury or damage to plaintiff's business" to which the Iowa Court of Appeals refers is "termination of the contract," and the "same requirement" applied to at-will employment contracts is the requirement that "[t]here must be substantial evidence of a predominant motive by the defendant to terminate the contract for improper reasons." *Id.* This statement, after all, precisely echoes the statement of the requirement for a claim of tortious interference with at-will employment by the Iowa Supreme Court in *Toney*. *See Toney*, 460 N.W.2d at 849 (stating the requirement as "there must be substantial evidence of a predominant motive on the part of Casey's to terminate the employment of Toney for improper reasons.").

This court holds, therefore, that when a defendant is alleged to have interfered with the plaintiffs at-will employment with a third party, "there must be substantial evidence of a predominant motive on the part of [the defendant] to terminate the employment of [the plaintiff] for improper reasons." *Toney*, 460 N.W.2d at 853; *RTL Distrib.*, 545 N.W.2d at 590. Furthermore, tailoring the elements of tortious interference claims to the context of tortious interference with at-will employment, the court finds that the elements the Kings must ultimately prove are the following:

1. The plaintiff was an at-will employee of a third person.

2. The defendant knew of the at-will employment relationship.

3. The defendant intentionally and improperly interfered with the plaintiffs employment relationship in that there must be substantial evidence of a predominant motive on the part of the defendant to terminate the employment of the plaintiff for improper reasons.

4. The interference caused the third person to terminate the plaintiff's employment.

5. The amount of damage.

See *Toney*, 460 N.W.2d at 853; *RTL Distrib.*, 545 N.W.2d at 590.

### 3. Summary judgment on the Kings' tortious interference claim

Finally, the court reaches the question of whether SCRG is entitled to summary judgment on the Kings' tortious interference claim, as the elements of that claim have been determined by the court. The parties agree that the answer to that question depends primarily on whether the Kings have generated a genuine issue of material fact as to the third element of their tortious interference claim, however that element is defined.

Whether the doctors intended to terminate King's employment, *i.e.*, whether their predominant motive was to terminate his employment, is, as explained above, a material issue to the Kings' tortious interference claim. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (a factual dispute is "material," and will therefore preclude summary judgment, if it "might affect the outcome of the suit under the governing law"); *Beyerbach*, 49 F.3d at 1326 (same); *Hartnagel*, 953 F.2d at 394 (same). As with the Kings' defamation claim, the record gives rise to reasonable inferences on this issue. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356 (a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts); *Quick*, 90 F.3d at 1377 (same). These inferences arise, in part, from the doctors' statements embodied in the May 13, 1994, letter, which suggest that the doctors' motive was to terminate King's employment. After all, that is what the doctors specifically requested. However, " '[i]ntent alone ... may not be sufficient to make the interference improper, especially when it is supplied by the actor's knowledge that the interference was a necessary consequence of his conduct rather than by his desire to bring it about.' " *See Toney*, 460 N.W.2d at 853 (quoting RE-

STATEMENT (SECOND) OF TORTS § 767 cmt. d). King's termination, even if intended by the doctors, was a very likely, perhaps even necessary, consequence of their complaints about King's management of the department, particularly if Feenstra had found those complaints well grounded. Thus, there is at least a genuine issue of material fact on the material issue of whether the defendants intended that King be terminated, not merely that they recognized King's termination might be a necessary consequence of their complaints.

The closer issue is whether the doctors' motive to terminate King's employment was for improper reasons, another material issue to King's tortious interference claim. *See Toney*, 460 N.W.2d at 853 (stating one element of a claim of tortious interference with at-will employment as whether the interfering defendant did so for an "improper reason"); *RTL Distrib.*, 545 N.W.2d at 590 (same). In *Toney*, the Iowa Supreme Court quoted comment d to RESTATEMENT (SECOND) OF TORTS § 767, which states that, because intent alone may be insufficient to establish tortious interference, " 'it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper.' " *Toney*, 460 N.W.2d at 853 (quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. d). The doctors assert—and there is evidence to support their position— that they sought King's termination for legitimate reasons, including the disharmony among the staff in the radiology department, which they attributed to King, and other examples of alleged mismanagement or failure to get along with medical and support staff. However, viewing the record in the light most favorable to the Kings, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. at 1356; *Quick*, 90 F.3d at 1377, there are also contrary inferences that their purpose was to get rid of King, with or without any legitimate, business-related justification. *See Toney*, 460 N.W.2d at 853 (interference is improper when it is not a " 'necessary consequence' " of the defendant's legitimate action, but is instead the result of the defendant's desire " 'to bring it

about,'" quoting RESTATEMENT (SECOND) OF TORTS § 767 cmt. d). These inferences again arise, at least in part, from the fact that, after some investigation, Terry Feenstra concluded that the doctors' complaints about King's performance in May of 1994 were without substance. *See Hartnagel,* 953 F.2d at 394 (an issue of material fact is genuine if it has a real basis in the record). Asserting unfounded allegations as the basis for demanding someone's termination gives rise to a reasonable inference that the termination is the speaker's goal, not rectifying problems stated in those allegations. Furthermore, as with the Kings' defamation claim, a reasonable inference also arises concerning improper reasons from portions of the record showing the apparent antipathy of one of the doctors for King over King's allegations about, and handling of, rumors concerning an extra-marital affair involving that doctor, and repeated efforts, or participation in efforts, of that doctor to have King removed over more than a year's time.

The court's responsibility at the summary judgment stage of the proceedings is not to weigh this evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick,* 90 F.3d at 1376–77; *Johnson,* 906 F.2d at 1237. On the present record, there are indeed such genuine issues of material fact. Therefore, the defendants' motion for summary judgment on the Kings' tortious interference claim will also be denied.[8]

### III. CONCLUSION

The Kings are entitled to partial summary judgment on their defamation claim to the effect that the statements in the May 13, 1994, letter upon which that claim is based are defamation *per se,* whatever their truth or falsity, because they impugn Gary King's competence in his profession and describe him as a liar. However, the defendants are not entitled to summary judgment on their cross-motion as it pertains to the Kings' defamation claim, because genuine issues of ma-

terial fact are apparent on their "qualified privilege" defense. Specifically, the court finds that the Kings have generated genuine issues of material fact on the doctors' "good faith" and lack of actual malice in making the defamatory statements in the May 13, 1994, letter.

The defendants also are not entitled to summary judgment on the Kings' tortious interference claim. Although the court concludes that the Kings must ultimately present substantial evidence of a predominant motive on the part of the defendants to terminate Gary King's employment for improper reasons, at this stage of the proceedings, the Kings have generated genuine issues of material fact on this multifaceted issue.

The plaintiffs' motion for partial summary judgment to the effect that the statements in the May 13, 1994, letter are defamatory *per se* is **granted.** The defendants' cross-motion for summary judgment on the defamation and tortious interference claims is **denied.**

**IT IS SO ORDERED.**

---

8. The defendants directly assert that the Kings cannot prove that any of their actions, even if improper and for the purpose of terminating King's employment, were a but-for cause of his termination, because King's poor relationship with the doctors was identified by Feenstra as only one of five reasons for terminating King.

Although the court agrees that the causal link here may be as tenuous as that supporting the defamation claim, the court nonetheless finds reasonable inferences that but for the doctors' actions, King might never have been terminated. Therefore summary judgment is not appropriate on this ground, either.